GOODWIN, INC. v ORSON E. COE PONTIAC, INC.
(SUPPLEMENTAL OPINION)

1. APPEAL AND ERROR—JUDGES—FINDINGS OF FACT—STANDARD OF
REVIEW—COURT RULES.

The standard upon which the Court of Appeals reviews a trial
court's findings is whether the findings were clearly erroneous
or against the great weight of the evidence (GCR 1963, 517.1).

2. DAMAGES—CONTRACTS—BREACH OF CONTRACT—MITIGATION OF
DAMAGES—MINIMIZING DAMAGES—BURDEN OF PROOF.

An injured party in a suit for breach of contract must make
every reasonable effort to minimize the damages suffered from
the breach, but the burden of proof is upon the party who
breached the contract to show in mitigation of damages
claimed that the injured party has not used every reasonable
effort within his power to minimize his damages.

3. DAMAGES—BREACH OF CONTRACT—MEASURE OF DAMAGES—LOST
PROFITS.

The measure of damages in a breach of contract suit is the actual
loss sustained by reason of the breach in order to place the
nondefaulting party in the same financial position in which he
would have been had there been no breach; lost profits are a
proper element of damages, if properly proved, and there must
be a reasonable degree of certainty for the calculations of the
lost profits as opposed to their being conjectural or speculative.

4. INTEREST—JUDGMENT—COUNTERCLAIM—TIME FOR ACCRUAL.

Interest on a money judgment awarded on a counterclaim for
breach of contract runs from the date of the filing of the
counterclaim.

REFERENCES FOR POINTS IN HEADNOTES
[1] 5 Am Jur 2d, Appeal and Error § 841.
[2] 22 Am Jur 2d, Damages §§ 296, 297, 330.
   Presumption and burden of proof regarding mitigation of damages.
   134 ALR 242.
[3] 22 Am Jur 2d, Damages §§ 47, 328–330.
[4] 22 Am Jur 2d, Damages § 187.

Appeal from Kent, George V. Boucher, J. Submitted April 6, 1972, at Grand Rapids. (Docket No. 11135.) Decided July 3, 1975.

Complaint by Goodwin, Inc. against Orson E. Coe and Orson E. Coe Pontiac, Inc., for breach of contract. Counterclaim for breach of contract. Judgment for defendant. Plaintiff appealed. Reversed and remanded, 43 Mich App 640 (1972). Defendants appealed. Reversed and remanded to the Court of Appeals, 392 Mich 195 (1974). Remanded for trial on the issue of damages.

*Warner, Norcross & Judd* (by *William K. Holmes* and *William H. Heritage, Jr.),* for plaintiff.

*Cholette, Perkins & Buchanan (Edward D. Wells,* of counsel), for defendants.

Before: LESINSKI, C. J., and D. E. HOLBROOK and T. M. BURNS, JJ.

### SUPPLEMENTAL OPINION

D. E. HOLBROOK, J. This case has previously been before this Court and the Supreme Court. *Goodwin, Inc v Orson E Coe Pontiac, Inc,* 43 Mich App 640; 204 NW2d 749 (1973), *rev'd* 392 Mich 195; 220 NW2d 664 (1974). Upon application for rehearing, the Supreme Court reaffirmed its opinion but vacated its affirmance of the trial court and remanded to this Court for further consideration of other issues previously raised but not discussed. The pertinent facts for background may be found in the opinions of this Court and the Supreme Court. Further facts where relevant will be discussed herein.

A number of these issues may be rather sum-

marily discussed and determined. The standard upon which we approach this case is that of whether the trial court, having sat without a jury, was clearly erroneous. GCR 1963, 517.1.

Due to the Supreme Court's determination, parol or extrinsic evidence was properly admitted. As such, a review of the extensive record does not reveal that the findings of the trial court were against the great weight of the evidence but rather that, at best, the evidence was in dispute and probably militated towards the conclusions of the trial court. The trial court's ruling as to breach of contract was not clearly erroneous.

Plaintiff asserts that defendant Coe failed in his duty to make every reasonable effort to mitigate damages. The trial court found that the defendants had "made every reasonable effort to mitigate damages". In *McCullagh v Goodyear Tire & Rubber Co,* 342 Mich 244, 255; 69 NW2d 731, 737 (1955), the Supreme Court stated:

"The general rule relative to mitigation of damages is well stated in *Rich v Daily Creamery Co,* 296 Mich 270, 282 [296 NW 253, 258] 134 ALR 232, 239 [1941], where we said:

" 'There is no question but that it is a well-established rule that in case of a breach of contract the injured party must make every reasonable effort to minimize the damages suffered and that it would be the duty of the court upon request so to charge the jury. We hold, however, under the authorities that the burden is upon the defendant to show in mitigation of the damages claimed that the plaintiff has not used every reasonable effort within his power so to minimize his damages. *Tradesman Co v Superior Manfg Co,* 147 Mich 702 [111 NW 343 (1907)], *Flickema v Henry Kraker Co,* 252 Mich 406 [233 NW 362] 72 ALR 1046 [1930], *Milligan v Haggerty,* 296 Mich 62 [295 NW 560 (1941)]. The same rule is applicable in tort actions as in actions for breach of contract.' "

We cannot say that the trial court was clearly erroneous in finding that defendants-counter-plaintiffs did make every reasonable effort to mitigate damages nor that plaintiff-counter-defendant carried his burden of demonstrating to the trial court's satisfaction that defendant did not in fact make every reasonable effort to mitigate damages. On appeal, plaintiff has asked this Court to accede to a somewhat unusual, if not incorrect, approach to this problem. One of the major issues in this case related to the 3-acre tract of land. Plaintiff here asserts that defendant Coe could have purchased that additional 3 acres of land himself and that such was, in fact, necessary in order to make every reasonable effort to mitigate damages. With this we do not agree.

## DAMAGES

Somewhat more complex and meritorious questions are presented under the trial court's award of damages. For purposes of analysis, the issues as presented by plaintiff are as follows: whether counter-plaintiff Coe failed to establish damages to a reasonable degree of certainty to take the recovery out of the reach of speculative or conjectural damages; whether the trial court erred in awarding damages for remodeling of the temporary facility used by Coe; whether the court erred in fixing lost profits for calendar years 1969 and 1970 at a total of $160,000; and whether interest on damages awarded should begin on the date injury is sustained.

In its opinion, the trial court wrote:

"[O]n the question of damages the court must keep in mind the general rule of law that damages should be those fairly and reasonably arising naturally from the

breach involved, or reasonably to have been in contemplation of all parties at the time of contracting as a probable result of the breach. The purpose of damages is to compensate for harm done in an effort to put the injured party in as good position as he would have been put by full performance at the least cost to the party responsible for the damages and without charging that party with losses that he had no sufficient reason to foresee when he made the contract. With those general rules in mind, the court feels that the defendants have, by a preponderance of the proof, shown damages reasonably resulting from the plaintiff's breach as follows: $20,000 in expenditures reasonably and nonrecoupably spent in making substitute premises suitable for the defendants' dealership. The court feels that any attempt by it to compare lease values would be pure speculation on the basis of the proofs that it has received. In the area of lost profits, as the court has construed this contract, a facility should have been completed, had the plaintiff not breached sometime in the fall of 1968, but to find lost profits in 1968 and to assume possession of the new facility at any time during the calendar year 1968 would again put the court in the position of pure speculation. This is not the case, however, for the years 1969 and 1970. Keying lost profits into a computation of what has been described in the testimony as 'fixed coverage' and using what the court has heard in the way of opinion testimony as the national average for 'fixed coverage', the court finds within the reasonable limits of the proofs that, because of the plaintiff's breaches, the defendants have lost profits in 1969 of $90,000 and in 1970 to trial of $70,-000. The court, therefore, finds total damages to have been $180,000."

In the automobile industry it appears that certain distinct factors in profit and loss statements are used; for our purposes herein, relevant are: fixed expenditures and fixed coverage. As well as we can understand from the testimony "fixed coverage" refers to the operation of the service and parts departments and the profits therefrom as

related to the total expenses of the business in a percentage amount. An employee of Pontiac Motor Division of General Motors Corporation testified that found under the heading of fixed expenditures, *inter alia,* are salaries, stationery, supplies, advertising considerations and rent. Introduced at trial was a chart prepared by the General Motors Corporation representative including these figures in comparison between the existing Coe dealership and two other dealerships, Front in Toledo, Ohio, and Rinke in Detroit, which for the most part could be said to be similar to Coe's dealership. (Chart attached as Appendix A.)

The General Motors representative testified that the national average of fixed coverage was 54.4% (used by the trial court), that the zone in which the Coe dealership was located had an average of approximately 61%. Thus, it is readily apparent that had the trial court used either determination of the average of the two other dealerships used for comparison purposes in the years of 1969 and 1970 or the zone average, the figure of damages would have been considerably higher. For reasons hereinafter stated we conclude that other factors which were not considered were no more speculative than those underlying the award as made. We note that little fault for this rests with the court but rather with the overly sophisticated and confusing presentation of damages made in this case.

Looking at the proofs with a rather jaundiced eye and searching for some sense of the whole rather than the parts, we would assume that, if there were validity to the General Motors' prepared chart, simple debits-credits figures leading to net income could be determined. Thus, the chart (Appendix A) contains two income, variable and fixed gross, figures and two debt, variable and fixed

expenditures, figures. Presumably, adding each set and subtracting for the years that damages were awarded would demonstrate (1) total gross income, (2) gross debits, and, (3) net profit before bonuses, taxes, etc. A review of Appendix B (our analysis under the foregoing approach) as compared with the General Motors' figures readily reveals glaring discrepancies. This is not to cast aspersions or to make findings of fact but rather only to demonstrate that something(s) is (are) not reflected therein and was (were) not explained to the trial court. We are at a loss to understand how the trial court could fairly and accurately decide this case when it wasn't presented with facts clearly and simply enough to understand the whole in a debits-credits approach much less a sophisticated part thereof that necessarily depended upon a complex, confusing set of definitions and factors used by either the auto industry in general or General Motors in particular.

The following colloquy occurred:

"*Q. (by Mr. Gruel, defense counsel):* Did you, at my request, Mr. Johnston, go through your district and come up with several dealerships that have been in operation for a number of years, that in your judgment would be comparable to the Coe situation in Grand Rapids?

"*A.* Yes, I have.

"*Q.* And from among the dealerships that you reviewed to make that selection, what dealerships did you select as comparables, in your professional opinion?

"*A.* Well, based on sales and the type of operation, we picked Front Pontiac, Toledo, and Rinke Pontiac in Detroit, and I think we went to the extreme because normally a single city point will do better than—both of these points happen to be multiple city points. So, I would say that we went to the extreme when we picked these, from a standpoint that Coe Pontiac figures should

look better than either Front or Rinke, normally speaking.

"*Q.* And did you, at my request, do a market analysis on Coe, Front and Rinke for the years 1968, '69 and '70, through September 1 of 1970?

"*A.* It's through August of '70.

"*Q.* Through the end of August?

"*A.* Right."

Further, there was questioning as to the greater discounts being given by defendant in order to sell cars in numbers at or above the national average. Using the dealers chosen by General Motors for comparison and the figures thereon of new car sales and variable gross, which was stated to be profit after discount on new cars, it is possible to explain the smaller profits in Coe's net income by Coe's greater discounts. See Appendix C.

We further conclude that the damages for loss of profits fall within what has been defined as expectation interest. "This is the interest of the nondefaulting party in being placed in the same financial position in which he would have been had there been no breach." 22 Am Jur 2d, Damages, § 46, p 73. The purpose of damages for breach of contract is to "put the plaintiff [counter-plaintiff] in as good a position as he would have been in had the defendant kept his contract". 5 Williston, Contracts (rev ed), § 1338, p 3763.[1] The damages should

---

[1] *See,* for instance, *Allen v Michigan Bell Telephone Co,* 61 Mich App 62; 232 NW2d 302 (1975), where the Court wrote:

"The object of the measure of damages in a breach of contract suit is to place the injured party in as good a position as he would have been in if the promise performance had been rendered. *Ambassador Steel Co v Ewald Steel Co,* 33 Mich App 495; 190 NW2d 275 (1971), *Dierickx v Vulcan Industries,* 10 Mich App 67; 158 NW2d 778 (1968). Lost profits, if properly proved, are a proper element of damages. *Brodsky v Allen Hayosh Industries, Inc,* 1 Mich App 591; 137 NW2d 771 (1965). However, before lost profits are recoverable there must be a reasonable degree of certainty for the calculations as opposed to their being conjectural or speculative. *The Vogue v Shopping Centers*

be equal to the value of performance. *Id.,* § 1339, p 3765. The injured party is not, however, entitled to be placed in a better position than he would have been if the contract had not been broken, *i.e.,* the measure of damages is the actual loss sustained by reason of the breach. Am Jur, *supra,* § 47, pp 74–75. Thus, deduction of any saving to the injured party must be made. Williston, *supra,* p 3764. *Cf.* Restatement, Contracts, § 329, pp 503–504. The lease negotiated by the parties to this controversy provided for land valuation of $275,000 and the construction of a building to be valued at approximately $600,000. On this basis defendant Coe was to pay a monthly rental figure of 1% or $105,000 per year. A review of Appendix D, with figures derived from the General Motors chart, which figures come from dealer reports, will demonstrate that Coe actually paid less than would have been paid had the contract been performed. There is no deduction for this amount, approximately $31,346, in the trial court's award of damages.

Therefore, while we are not desirous of extending this lawsuit over any greater period of time, we can see no alternative other than to remand the case for a new trial on the issue of damages wherein the parties may present to the trial court clearer, more understandable testimony which is totally inclusive of all relevant factors and not selectively exclusive.

Next, plaintiff asserts that the amount allowed for refurbishing of temporary premises upon which Coe conducted business was erroneous. With this we cannot agree as the record reveals that there were expenditures of some approximately $60,000

*Inc,* 58 Mich App 421; 228 NW2d 403 (1975), *Fister v Henschel,* 7 Mich App 590; 152 NW2d 555 (1967)."

and bills were presented to substantiate such. The trial court, however, did not allow that total figure as it found that $40,000 of the $60,000 had been expended by Coe Realty, Inc., not a party herein, and disallowed said two-thirds.

Finally, plaintiff argues that interest on the damages awarded should begin on the date the injury was sustained. The trial court awarded damages at the statutory rate to begin as of December 2, 1968, being the date of the filing of the counter-complaint. Plaintiff asserts that as of December 2, 1968, defendant Coe had sustained no injury.

MCLA 600.6013; MSA 27A.6013 provides in pertinent part:

"Interest shall be allowed on any money judgment recovered in a civil action, such interest to be calculated from the date of filing the complaint at the rate of 5% per year unless the judgment is rendered on a written instrument having a higher rate of interest in which case interest shall be computed at the rate specified in the instrument if such rate was legal at the time the instrument was executed."[2]

We are not at liberty to determine, nor logically could we find, that a different standard than that found in the statute is to be applied to a counter-complaint. Thus, interest after damages are awarded should run from the date of the filing of the counter-complaint.

Remanded for a trial on the issue of damages in accordance with this opinion. We retain no jurisdiction. No costs, as neither party has prevailed fully.

[2] Amended by 1972 PA 135, eff March 30, 1973, to provide for interest at 6% which rate is here inapplicable.

APPENDIX  A*

| | 1970 Jan. – Aug. | | | 12 Months 1969 | | |
|---|---|---|---|---|---|---|
| | FRONT | COE | RINKE | FRONT | COE | RINKE |
| N.C. Sales | 802 | 1001 | 1028 | 1443 | 1910 | 2103 |
| U.C. Sales | 983 | 1008 | 1174 | 1445 | 1632 | 1720 |
| Var. Gross | 443,719 | 352,127 | 446,944 | 726,904 | 561,041 | 757,822 |
| Var. Exp. | 138,259 | 119,231 | 138,918 | 229,150 | 187,457 | 223,842 |
| Rent Equiv | 42/33,629 | 66/65,951 | 46/47,220 | 38/54,193 | 41/77,613 | 37/76,804 |
| Fixed Exp. | 510,678 | 509,722 | 464,060. | 765,999. | 719,297. | 736,005 |
| Fixed Gross | 312,838 | 222,738 | 321,360 | 488,126 | 303,228 | 466,809 |
| Fixed Cov. | 61% | 44% | 69% | 64% | 42% | 63% |
| % Ret on Sales | 1.9 | Loss | 2.6 | 2.3 | .3 | 2.2 |
| % Ret on Inv. | 18.6 | Loss | 21.2 | 25 | 8.4 | 36.0 |
| Net Profit Bef. B & T | 99,329 | [Loss] 65,853 | 161,630 | 190,439 | 27,495 | 247,674 |

* 1968 Deleted as not herein applicable.


Key to Abbreviations
    N.C. Sales ~ New Car Sales
    U.C. Sales ~ Used Car  Sales
    Var. Gross ~ Variable Gross
    Var. Exp. - Variable Expenditures
    Rent  Equiv. - Rent Equivalent
    Fixed Exp. ~ Fixed Expenditures
    Fixed  Cov. - Fixed Coverage
    % Ret. on Sales - % Return on Sales
    % Ret. on Inv. - % Return on Inventory
    Net Profit Bef. B & T - Net Profit before bonuses and taxes

APPENDIX   B

1970  Jan. - Aug.

1969

|  | FRONT | COE | RINKE | FRONT | COE | RINKE |
|---|---|---|---|---|---|---|
| Variable Gross | 443,719 | 352,127 | 446,944 | 726,904 | 561,041 | 757,822 |
| Fixed Gross | 312,838 | 222,738 | 321,360 | 488,126 | 303,228 | 466,809 |
| Total Gross | 756,557 | 574,865 | 768,304 | 1,215,030 | 864,269 | 1,224,631 |
| Variable Expenditures | 138,259 | 119,231 | 138,918 | 229,150 | 187,457 | 223,842 |
| Fixed Expenditures | 510,678 | 509,722 | 464,060 | 765,999 | 719,297 | 736,005 |
| Total Expenditures | 648,937 | 628,953 | 602,978 | 995,149 | 906,754 | 959,847 |
| Total Gross | 756,557 | 574,865 | 768,304 | 1,215,030 | 864,269 | 1,224,631 |
| Total Expenditures | 648,937 | 628,953 | 602,978 | 995,149 | 906,754 | 959,847 |
| Net Income Before Bonuses & Taxes | 107,620 | [Loss] 54,088 | 165,326 | 219,881 | [Loss] 42,485 | 264,784 |

APPENDIX   C

DISCOUNT DIFFERENTIALS*

| | 1970   Jan. – Aug. | | 1969 | | |
|---|---|---|---|---|---|
| PROFIT PER CAR | | DIFFERENCE | PROFIT PER CAR | | DIFFERENCE |
| Coe | 352 | | Coe | 294 | |
| Front | 555 | 203 | Front | 503 | 209 |
| Rinke | 435 | 83 | Rinke | 360 | 66 |

TOTAL GROSS CHANGE COE

| | | |
|---|---|---|
| Plus Front | 203,000 | 399,190 |
| Plus Rinke | 83,000 | 126,060 |

1969 and 1970 through August

| | |
|---|---|
| Maximum Difference | 602,190 |
| Minimum Difference | 209,060 |

APPENDIX   D

RENT DIFFERENCE*

| UNDER COE-GOODWIN CONTRACT | | ACTUALLY PAID |
|---|---|---|
| 1969 | 105,000 | 77,613 |
| 1970 Jan.-Aug. | 70,000 | 65,951 |
| Total | 175,000 | 143,564 |

DIFFERENCE

| | |
|---|---|
| 1969 | 27,387 |
| 1970 Jan.-Aug. | 4,049 |
| Total through Aug. 1970 | 31,436 |

* Figures approximated for analytical and
      demonstration purposes.