**CENTRAL JERSEY DODGE TRUCK CENTER, INC., Plaintiff-Appellee,**

v.

**SIGHTSEER CORPORATION and PRF Industries, Inc., Defendant-Appellant.**

No. 77–1122.

United States Court of Appeals, Sixth Circuit.

Argued Feb. 21, 1979.

Decided Oct. 25, 1979.

Michael G. Vartanian, Robert S. Krause, Dickenson, Wright, McKean, Cudlip & Moon, Detroit, Mich., for defendant-appellant.

Timothy D. Wittlinger, Hill, Lewis, Adams, Goodrich & Tait, John D. Mabley, Detroit, Mich., for plaintiff-appellee.

Before CELEBREZZE, KEITH and MERRITT, Circuit Judges.

KEITH, Circuit Judge.

Central Jersey Dodge Truck Center, Inc. (Central Jersey), appeals from a judgment below in holding that it lacked a cause of action in this diversity action against Sightseer Corporation (Sightseer), and its parent, PRF Industries, Inc. (PFR), for breach of contract.[1] We reverse.

### Facts

PRF, through various subsidiaries, manufactures and sells three lines of recreational vehicles: Travco, Family Wagon, and Sightseer. In September 1972, Central Jersey's principals met with representatives from Travco, Family Wagon, and Sightseer to discuss possible representation of their vehicular lines. During the course of these meetings, Central Jersey agreed to become a dealer in certain counties of New Jersey for the three recreational vehicle lines manufactured by the PRF subsidiaries.

With respect to the vehicles manufactured by Sightseer, a document entitled "Interim Agreement" was signed by Sightseer's regional manager who was present at the meeting. The agreement provided that Central Jersey would be a Sightseer "dealer" for an interim period of six (6) months, or until March 6, 1973. Pursuant to this agreement, Central Jersey purchased ten (10) Sightseer vehicles for $113,000.[2] The purchase was financed by the Chrysler Credit Corporation. Subsequently, a document entitled "Dealer Agreement" bearing the date of September 19, 1972, was signed by both Central Jersey and Sightseer.[3]

---

1. Sightseer ceased manufacturing operations subsequent to the transactions forming the basis of this lawsuit. However, PRF, Sightseer's parent corporation, agreed by corporate resolution to guarantee Sightseer's contractual obligations. It has, therefore, been made a party to this action.

2. The provision relating to "minimum inventory" was left blank in this document.

3. Mr. Harding, one of Central Jersey's principals, testified that when he signed the agreement, it had been neither dated nor signed by Sightseer.

After receiving and paying for ten (10) units, Central Jersey received a check from Sightseer, dated October 12, 1972, in the amount of $10,000 which represented the $1,000 per unit rebate orally agreed upon by the parties at their initial meeting in September, 1972. Central Jersey contends that the oral agreement also provided that Sightseer would repurchase the units if Central Jersey should prove unable to sell them.

The sale of recreational vehicles in Central Jersey's sales area failed to prove profitable. In a letter dated March 23, 1973, having sold none of the Sightseer units, Central Jersey informed Weinsz, Sightseer's representative, that it wished to return all Sightseer units pursuant to the alleged oral agreement. Sightseer made no response to this letter. Following several inconclusive telephone conversations, Central Jersey again wrote to Weinsz on May 16, 1973, stating that "you suggested that we take 10 units with the understanding . . . that we would be able to return these units at anytime for full credit." (Plaintiff's Exhibit 11). Again, Sightseer failed to respond.

Central Jersey, still having sold none of the units and unable to obtain a favorable response from Sightseer, began selling the units at automotive auctions in November, 1973. These auction sales were made only after counsel for Central Jersey notified counsel for Sightseer of Central Jersey's intention to so dispose of the units and Sightseer's continued denial of any obligation with respect to the vehicles. The last of the ten units were sold in January 1974.[4]

Upon completion of the auction sales, Central Jersey brought the present action on April 5, 1974, alleging that Sightseer breached its oral agreement to repurchase the vehicles in the event Central Jersey proved unable to sell them. The complaint alleged that Central Jersey had sustained damages including, but not limited to, lost profits, losses on sales of the mobile homes below the purchase price, floor plan interest, and advertising and sales expense, in an amount exceeding $66,000. In addition, the complaint alleged that Sightseer had failed and refused to reimburse Central Jersey for certain additional advertising expenses incurred in connection with the sale of said mobile homes and prayed for a judgment against Sightseer Corporation and PRF Industries, jointly and separately in the amount of $85,000, together with interests, costs, and attorney's fees.

## I

The district court credited testimony that prior to the parties' entering into the written dealer agreement, there was an oral agreement between them which provided that if Central Jersey would take ten vehicles, Sightseer would repurchase the vehicles if, after a reasonable time, it appeared that Central Jersey would be unable to sell the vehicles. The court found that while the minimum initial order for becoming a dealer was two or three vehicles, Central Jersey had initially ordered ten units (rather than the minimum two or three required to become a dealer) in reliance upon, and only because of, Sightseer's representative's oral promise to repurchase the vehicles in the event Central Jersey was unable to sell them.[5]

However, the district court concluded that since the oral repurchase agreement was entered into by the parties prior to the written dealer agreement, a provision in the written agreement expressly disclaiming any obligation on the part of Sightseer to repurchase the motor homes from Central

4. The total purchase price for the vehicles, including freight charges, was $113,753.84. Total floor plan interest incurred by Central Jersey was $11,531.11. Twenty-five percent of Central Jersey's advertising expense, which Sightseer had agreed to pay was $1,894.22. Total proceeds of these auction sales were $60,590.00. Central Jersey contends that its total damages were $66,589.17.

5. The district court stated that "[w]hile Weinsz testified that he made no such oral promise and that ten units constituted the minimum initial order based on the size of Central Jersey's sales area, the court does not credit Weinsz's testimony in view of the preponderant evidence to the contrary."

Jersey operated to cancel and supersede the prior oral agreement (App. 55a).[6]

Additionally, the court credited testimony from Weinsz that he had agreed on Sightseer's behalf to reimburse 25% of plaintiff's advertising expenses, and found that 25% of plaintiff's advertising expenses in connection with the Sightseer dealership amounted to $1,894.22. Nevertheless, since the agreement creating defendant's obligation here was the oral agreement reached at the meeting on September 8, 1972—prior to the written agreement of September 19, 1972—it, too, was rescinded by paragraph 30.1.

In essence, the district court held that despite the oral agreement, the provision in the written contract stating that the written contract embraces all of the agreements between the parties precluded recovery pursuant to the oral agreement.

The sole issue before us on this appeal concerns whether the district court erred in finding that the parties' oral repurchase agreement was superseded and cancelled by the September 19th written agreement. We believe that it did.

## II

In this diversity case, this court is bound to turn to state law for guidance. *Erie R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).[7] Thus we turn first to Michigan law.

The courts of Michigan have often addressed themselves to the rules of contract construction. They, as other courts, have recognized that a court's primary task in construing a contract is to give effect to the parties' intention.

In *DeVries v. Brydges*, 57 Mich.App. 36, 41, 225 N.W.2d 195, 198 (1974), the Court stated:

In determining contractual rights and obligations, a court must look to the intention of the parties, and a contract should always be construed so that it carries that intention into effect. When the words of a written contract are clear and unambiguous and have a definite meaning, the court has no right to look to extrinsic evidence to determine their intent. Indeed, if the language of the entire contract is clear and unambiguous, there is no room for construction by the courts, and in such case, the language must be held to express the intention of the parties and the court need not search for meanings nor indulge in inferences as to the intention of the parties.

In *Henry v. J. B. Publishing Company*, 54 Mich.App. 409, 413, 221 N.W.2d 174, 175 (1974), the court allowed that "[i]f, however, a contract term is ambiguous or rendered indefinite or uncertain when applied to the facts of a particular situation then additional evidence should be considered to determine what the parties intended." *See Berk v. Gordon Johnson Company*, 232 F.Supp. 682, 687 (E.D.Mich.1964); *Associated Truck Lines v. Baer*, 346 Mich. 106, 77 N.W.2d 384 (1956).

In *Associated Truck Lines v. Baer*, 346 Mich., at 110, 77 N.W.2d, at 386 (1956), the Michigan Supreme Court reaffirmed the controlling rule of construction:

> " ' "It is a cardinal principle of construction that a contract is to be construed as a whole; that all its parts are to be harmonized so far as reasonably possible; . . . and that no part is to be taken as eliminated or stricken by some other part unless such a result is fairly inescapable." ' * * * . ' "Every word in the agreement must be taken to have been used for a purpose, and no word should be

---

**6.** The court held that the parties' mutual rescission of all prior agreements in the written contract also acted to terminate the contractual obligations as to price, quantity, delivery date, and rebate to the extent that these obligations arose from an order placed and accepted prior to the execution of the written agreement of September 19, 1972. But as the parties agreed that these terms were all performed, and no

one claimed having a breach of any such terms, the court said it was immaterial whether or not the performance was made pursuant to binding contractual obligations. Thus, Central Jersey was permitted to keep the rebate.

**7.** The parties do not dispute the applicability of Michigan law here.

rejected as mere surplusage if the court can discover any reasonable purpose thereof which can be gathered from the whole instrument." ' " *Laevin v. St. Vincent de Paul Society of Grand Rapids*, 323 Mich. 607, 609–610 [36 N.W.2d 163, 164] (1949) [8]

█ The parties' intention in making a contract is to be ascertained by construing it in the light of circumstances existing at the time it was made, and the manifest intent must prevail over the literal sense of the terms. " 'And in order that the court may see just how the transaction came about and received the shape it actually bears, a reference is proper to the surrounding facts. . . . There is no requirement to adhere to the literal terms in derogation of the interior sense of the transaction.' *Stuart v. Worden*, 42 Mich. 154, 160, [3 N.W. 876, 880]." *Moulton v. Lobdell-Emery Mfg. Co.*, 322 Mich. 307, 310, 33 N.W.2d 804, 806 (1948). *See also, Sobczak v. Kotwicki*, 347 Mich. 242, 79 N.W.2d 471 (1956).

Noting that the oral repurchase agreement was made prior to the written agreement, the court held it subject to paragraph 30.1 of the dealer agreement which provides:

"This Agreement is the entire agreement between the parties relating to the purchase by Dealer of products from Sightseer and it cancels and supersedes all earlier agreements, written or oral, between Sightseer and Dealer relating to the purchase and sale by Dealer of such products."

The district court found that by the language quoted above, "the parties expressed the unequivocal intention to terminate any prior agreements." We disagree.

First, the district court appears to have relied exclusively upon paragraph 30.1 to support its finding. In doing so, the district court failed to give adequate consideration to other provisions of the contract. In addition to paragraph 30.1 of the written dealer agreement, which provides that the written agreement is the entire agreement between the parties, paragraph 25.6 provides:

"Unless otherwise obligated by statute or contract, Sightseer shall have no obligation, upon termination or expiration of this Agreement, to purchase all or any part of Dealer's inventory of Sightseer Motor Homes. . . ."

In considering this provision, the district court emphasized the language which states that "Sightseer shall have no obligation, upon termination or expiration of this agreement, to purchase all or any part of Dealer's inventory of Sightseer Motor Homes. . . .," while completely ignoring the introductory phrase, "[u]nless otherwise obligated by statute or contract." And while the court stated, without further comment that "[f]urther light is cast upon the intent of the parties by paragraph 25.6," it failed to make any use of it.

█ The apparent conflict between paragraph 30.1 and 25.6 renders the instrument ambiguous. "In consequence, the Court, on the record before it, must determine upon consideration of the agreement as a whole, what was the real intent of the parties; and, if not violative of law, give effect thereto." *Klever v. Klever*, 333 Mich. 179, 186, 52 N.W.2d 653, 656 (1952). In so doing, we must be guided by Michigan law, which holds that a contract is to be strictly construed against the drafter, *Ladd v. Teichman*, 359 Mich. 587, 592, 103 N.W.2d 338, 341 (1960) and that the *first* of two conflicting clauses or provisions in a contract controls, *Klever, supra*, 333 Mich. at 189, 52 N.W.2d 653. *See also, Putnam v. Pere Marquette R. Co.*, 174 Mich. 246, 140 N.W. 554 (1913); *J. J. Fagan & Co. v. Burns*, 247 Mich. 674, 226 N.W. 653 (1929);

---

**8.** The Court is aware that the *Associated Truck Lines* court, while noting the above-quoted rule of construction as the general rule, distinguished the holding in *Laevin* from its own holding in which it deleted the first word of a clause of the contract in question. The court stated that to give the contended for effect to the word would have rendered the entire provision meaningless and without purpose. "[U]seful as other rules of construction may be, paramount is the one that effect must be given to the intent of the parties gathered from the instrument as a whole," at 112, 77 N.W.2d, at 387.

*Higbie v. Chase*, 306 Mich. 577, 11 N.W.2d 248 (1943).

■ Our review of the contract and the circumstances attending its execution persuades us that the oral repurchase agreement "otherwise obligated" Sightseer by contract within the meaning of the first part of paragraph 25.6 and that, paragraph 30.1 notwithstanding, the written dealer agreement was never intended as the sole and entire agreement between the parties.

Secondly, we believe that the district court failed to give adequate consideration to all of the facts and circumstances surrounding the drawing up of the contract. The fact that 1) the agreement had been neither dated nor signed by Sightseer at the time it was executed by Central Jersey, *see* note 3; that 2) the minimum inventory provision was left blank; and that 3) the contract, as finally drafted, failed to mention either price, quantity, delivery date, or the rebate, all connote the informal atmosphere in which the parties acted. Instead of suggesting that the parties intended the written agreement to embody their final and only agreement, these facts suggest more that the parties were continuing to act informally and that the written agreement was of the same cloth as their prior dealings. Moreover, Sightseer's representative in charge of this account apparently had no knowledge of the written agreement until the day of trial.

Additionally, close scrutiny of the parties' actions subsequent to the execution of the written dealer agreement also makes clear that neither Central Jersey nor Sightseer's representative in charge of this account intended that the written agreement supersede and cancel the repurchase agreement. The testimony credited by the court below was as follows:

Mr. Sullivan testified that after the September meetings at which the parties had entered into the oral agreement he and Mr. Harding asked Weinsz to send them a letter confirming the repurchase agreement. Weinsz indicated that the letter would be forthcoming. Such a letter never arrived.

Sometime in late January of 1973, Mr. Weinsz was promoted to a different position with Sightseer and he was replaced by Mr. James Barone as regional manager. Mr. Barone sent Central Jersey a document entitled "Interim Sales Agreement" which seemed to extend the terms of the September 6, 1972, Interim Agreement between Sightseer and Central Jersey for an additional three months or until June 7, 1973. This document was signed by Barone for Sightseer, but was never signed by Central Jersey.

On March 22, 1973, Central Jersey, still unable to sell any of the Sightseer vehicles, and still not having received a written confirmation of the agreement to repurchase, despite the repeated assurances of Weinsz that Sightseer would repurchase, wrote a letter to Sightseer requesting that Sightseer repurchase the ten units. No response was ever received by Central Jersey to this letter.

At Central Jersey's request, Mr. Stu Grey, the Chrysler Credit representative with whom they dealt concerning their floor plan financing arrangement, wrote to Sightseer on April 4, 1973, inquiring as to "when" the ten units would be repurchased by Sightseer. Mr. Grey received no response from sightseer to this letter. Mr. Grey testified, however, that he spoke with Mr. Weinsz by phone several times and that Mr. Weinsz led him to believe that a check would be forthcoming.

Mr. Harding testified that he spoke with Mr. Weinsz by phone on April 19 and Mr. Weinsz indicated that Central Jersey should receive Sightseer's check repurchasing the ten units within two weeks. The check never arrived. On May 16, 1973, Central Jersey wrote another letter to Sightseer requesting that it honor its agreement to repurchase the ten vehicles. No response was received. Numerous phone calls were made by various parties to Sightseer. Most of these calls were taken by Mr. Weinsz who indicated that things were being taken care of and that a check would be sent

shortly. On one occasion, however, Mr. Grey spoke with a gentleman who advised him that no purchase arrangement was ever made and that a check would not be sent.

Moreover, the equities lie with Central Jersey in this case. Central Jersey was actively led to believe throughout the entire period in which it had dealings with Sightseer that Sightseer would buy back those vehicles which Central Jersey was unable to sell. At every turn both parties' behavior reflected this understanding of their contractual arrangement. In addition, the court below found that Central Jersey ordered ten units when the minimum dealer order was two or three only *in reliance upon* Sightseer's promise to repurchase the vehicles in the event that Central Jersey would not be able to sell them. And finally, after having spent over $100,000 with Sightseer, Central Jersey's letters of inquiry should not have been ignored.

Weinsz kept Central Jersey believing that the buy-back would be effective up until the very end. It may be that in leading Central Jersey to believe that the oral repurchase agreement was still in effect, Sightseer's representative acted without authorization. However, he at least had apparent authority to represent Sightseer.

The district court's interpretation of the written contract, when considered without reference to the surrounding facts which necessarily inform the court's interpretation of the parties' intent, would probably be sustained. However, our review of pertinent Michigan authority persuades us that such an interpretation cannot stand in the circumstances of this case.

Thus, we are fully convinced from consideration of the written dealer agreement as a whole, and of the facts and circumstances attending its execution, that the parties thereto never intended that it should supersede and cancel the oral repurchase agreement.

■ In essence, we hold that, in the circumstances of this case, the district court erred in reading paragraph 30.1 of the written dealer agreement as superseding and cancelling the prior oral repurchase agreement. We hold further that paragraph 25.6 contemplated the oral repurchase agreement as a valid and binding prior contract and that the written agreement can and must be supplemented therewith. *See* M.C. L.A. § 440.2202(b).[9]

### III

While the court below relied exclusively on paragraph 30.1 in holding that plaintiff could not recover on the oral contract in this case, our review of the parol evidence rule also persuades us that the oral agreement survived the written agreement of September 19, 1972.

The Michigan Parol Evidence Rule states that:

Terms with respect to which the confirmatory memoranda of the parties agree or which are otherwise set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement but may be explained or supplemented by evidence of consistent additional terms unless the court finds the writing to have been intended also as a complete and exclusive

---

9. This court is not unmindful of the fact that the existence of an oral contract at the beginning of a transaction does not insure that it will maintain legal force through to the end of the transaction. It could have been rescinded. *Chatham, Inc. v. Ajax Paving, Inc.*, 370 Mich. 334, 339, 121 N.W.2d 836, 839 (1963) (" 'no one doubts that a contract, even a written contract, may be rescinded or may be modified subsequently. Such modifications may be in writing or oral.' "). See *Denler & Denler Land Co. v. Eby*, 277 Mich. 360, 364, 269 N.W. 203, 204 (1936) (". . . it is legally possible to have mutual cancellation of an executory contract, notwithstanding the same has been partially performed."). However, the facts convince us that the parties never intended to rescind the prior oral contract.

statement of the terms of the agreement.[10]

M.C.L.A. § 440.2202(b).

The principle that parol evidence is admissible either to prove the existence of ambiguity or to indicate the actual intent of the parties once ambiguity has been demonstrated was reiterated in *Goodwin v. Coe Pontiac*, 392 Mich. 195, 220 N.W.2d 664 (1974), vacated in part on other grounds, 224 N.W.2d 53, on remand on other grounds 62 Mich.App. 405, 233 N.W.2d 598 (1975). Analogous to the instant case, the ambiguity in issue in *Goodwin* was a clause in a buy-sell agreement involving an automobile dealership in which the property to be conveyed was insufficiently described. The buyer contended that he was induced to believe by the seller's oral representations and informal diagrams made prior to the execution of their written agreement, that the parcel to be sold was three acres larger than it in fact was.[11]

The *Goodwin* court concluded that, in view of the ambiguity "that goes to the very heart of the contract," established by the "cavalier" and "informal" tenor of the parties' prior negotiations, the admission of parol evidence was essential to the proper construction of the contract, as such evidence could be used to indicate the actual intent of the parties.

Moreover, where the oral contract served as an inducement to the written contract, the courts have been particularly willing to admit the oral evidence to indicate the intent of the parties as an aid to construing the contract. See *Stimac v. Wissman*, 342 Mich. 20, 69 N.W.2d 151 (1955). In *Clare County Savings Bank v. Featherly*, 173 Mich. 292, 301, 139 N.W. 61, 65 (1912), the court noted that "[t]he general rule admitting evidence of a collateral agreement is especially applicable where such agreement operates as an inducement for entering into the written agreement."

**IV**

■ Finally, Sightseer contends that even assuming that the oral repurchase agreement survived the written dealer agreement, it is unenforceable because it violates the Michigan Statute of Frauds. See M.C.L.A. § 440.2201.[12] The crux of Sightseer's contention is that the oral repurchase agreement is an "or return" agreement within the meaning of M.C.L.A. § 440.2326(4)[13] and, as such, constitutes a

---

**10.** For a comprehensive discussion of the Parol Evidence Rule as applied in Michigan see *Goodwin v. Coe*, 392 .Mich. 195, 220 N.W.2d 664 (1974).

"It is well established that where a contract is clear and unambiguous, parol evidence of negotiations cannot be admitted to vary the contract." [*Goodwin v. Coe Pontiac*, 43 Mich.App. 640 (1972)]

A number of well-established exceptions to the parol evidence rule have been recognized, however, by Michigan courts. For example, the rule does not preclude admission of extrinsic evidence showing: that the writing was a sham, not intended to create legal relations; that the contract has no efficacy or effect because of fraud, illegality, or mistake; that the parties did not "integrate" their agreement, or assent to it as the final embodiment of their understanding; or that the agreement was only "partially integrated" because essential elements were not reduced to writing. [references omitted] *Goodwin v. Coe*, 392 Mich. 195, 204, 220 N.W.2d 664, 668 (1974).

**11.** Parol evidence established that the buyer had no intention of buying a property of the size and configuration of the lot the seller had under land contract because it could not possibly have supported the size of automobile dealership contemplated.

**12.** The Michigan Statute of Frauds provides in pertinent part:

Except as otherwise provided in this section a contract for the sale of goods for the price of $500.00 or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker.

M.C.L.A. § 440.2201.

**13.** M.C.L.A. § 440.2326(4) states that

Any "or return" term of a contract for sale is to be treated as a separate contract for sale within the statute of frauds section of this article (section 2201) and as contradicting the sale aspect of the contract within the provisions of this article on parol or extrinsic evidence (section 2202).

separate contract for sale within the statute of frauds section of this article. *See Baumgold Brothers, Inc. v. Allan M. Fox Company, East*, 375 F.Supp. 807 (N.D.Ohio 1973).

Plaintiff argued to the court below that the repurchase agreement did not violate the statute of frauds. The district court, finding that the oral agreement was cancelled by the written agreement, did not reach this question. However, we find plaintiff's contentions no obstacle to upholding the repurchase agreement as valid and binding on the parties.

If the orally agreed upon buy-back arrangement is found to be a part of the written contract for the sale of the vehicles, it is enforceable under the provision of section 2201 which states that "[a] writing is not insufficient because it omits or incorrectly states a term agreed upon . . ." In this case, parol evidence may be used to supplement the written contract and to illuminate the intent of the parties as expressed in the written contract. However, even if the buy-back agreement does constitute a separate contract for sale, hence subject to the statute of frauds, the agreement is not barred by the statute of frauds because the parties have admitted in word and deed their intention that Sightseer would buy back those vehicles which Central Jersey found itself unable to sell. *See Baumgold Brothers, supra*; and *Chrysler Corp. v. Majestic Marine, Inc.*, 35 Mich.App. 403, 192 N.W.2d 507 (1971).

V

Accordingly, we hold that the oral agreement between Sightseer and Central Jersey is a valid and binding agreement on the parties and that the trial court erred in holding that the written agreement superseded the oral agreement. Reversed, and remanded for further proceedings not inconsistent with this opinion.