NBD BANCORP, INC. and NBD Northwest Bank, N.A., Plaintiff,

v.

FEDERAL DEPOSIT INSURANCE CORPORATION, Defendant.

Civ. No. 85–71370.

United States District Court, E.D. Michigan, S.D.

Sept. 25, 1986.

H.G. Sparrow, III, Detroit, Mich., for plaintiff.

Michael B. Lewiston, Detroit, Mich., for defendant.

## MEMORANDUM OPINION AND ORDER

ANNA DIGGS TAYLOR, District Judge.

This case involves a dispute over the price to be paid to the Federal Deposit Insurance Corporation by an assuming bank for the furniture, fixtures and equipment of a failed bank. This court has jurisdiction over the case pursuant to 12 U.S.C. § 1819 and 28 U.S.C. § 1331. The matter was tried by the court on June 24, 1986 and this memorandum constitutes the court's findings of fact and conclusions of law.

On March 9, 1984, the National Bank & Trust Company of Traverse City (Traverse City Bank) failed and was closed. The Federal Deposit Insurance Corporation (FDIC) was appointed as Receiver. On Thursday, March 9, 1984, plaintiff, NBD Bancorp, Inc. (NBD), was invited to bid for the assets and liabilities of the failed Traverse City Bank. The FDIC provided NBD with a form entitled Instructions and Conditions for Bidding. Attached to the three-page Instruction Form were a one-page Bid Form, a twenty-nine page Purchase and Assumption Agreement and an eight page Indemnity Agreement.

The Instruction Form specified that each bidder was required to submit its bid without change on the Bid Form provided, and "[a]ny bid conditioned upon any change in the Agreement, the Indemnity, or [the] bid form, either by way of addition or deletion [could] be summarily rejected by the Receiver, in its sole discretion." By signing the Bid Form the bidder agreed that in the event that it was chosen as the successful bidder, it would sign the Purchase and Assumption Agreement with the Receiver and the Indemnity Agreement with the FDIC.

NBD submitted its bid for $3,543,000.00 on March 9, 1984 and was designated as the successful bidder. That same day, plaintiff NBD Northwest Bank (Northwest), a national banking association wholly-owned by NBD was organized as the "assuming bank." Northwest and the FDIC signed the Purchase and Assumption Agreement and the bank reopened on Monday, March 12, 1984 as NBD Northwest Bank.

The Purchase and Assumption Agreement provided that the assuming bank would purchase from the receiver all of the furniture, fixtures and equipment (FF & E) except those items retained by the receiver at its option. The value of the FF & E was initially designated as their book value, subject to later adjustment to their fair market value as of the bank closing. The fair market value was to be determined within sixty calendar days following the bank closing by using the appraisal figure supplied by an appraiser mutually acceptable to the receiver and the assuming bank. Depending upon whether the fair market value was higher or lower than the book value, the assuming bank would either owe the excess or be entitled to a refund from the receiver. The book value of the FF & E was approximately $770,000.00.

As stipulated in the Purchase and Assumption Agreement, the parties agreed to hire Norman Levy Associates, Inc. (Levy Associates) for the appraisal. Levy Associates was initially contacted by Clifford Pet-

ersen, a liquidation assistant employed by the FDIC. Although no FDIC employee remembered specifically giving Levy Associates its instructions for preparing the appraisal, it is undisputed that defendant provided whatever direction was given to the appraisers. No one associated with plaintiffs ever spoke to anyone at Levy Associates. The FDIC provided Levy Associates with a detailed inventory list of the items to be appraised and on March 26–29, 1984, an appraisal of the FF & E of the Bank's main branch and nine branch offices was conducted.

For reasons unexplained by any party, the appraisal performed by Levy Associates contained two figures. The total "fair market" value of the FF & E was appraised as $361,540.00 and the total "in-place" value of the FF & E was appraised as $918,115.00. These two figures and the meaning of the terms which they represent constitute the basis for this lawsuit. Plaintiffs believe that the lower figure, designated as the fair market value, the appraisal term specified in the Purchase and Assumption Agreement, is the correct amount of their liability. Defendant maintains that regardless of designation, the higher figure, representing the in-place value, is appropriate because the items were to be used as part of an ongoing operation.

The parties agree that federal law governs the interpretation of the contract. Federal law controls cases involving the rights of the United States which arise under nationwide federal programs such as the FDIC. *Warner v. FDIC,* 605 F.Supp. 521, 526 (S.D.Ohio 1984) (citing *D'Oench, Duhme & Co. v. FDIC,* 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942)). However, in basic contract actions such as the case now before the court, which have traditionally been the province of the state, where no federal common law has developed, and where no federal statute provides the appropriate rule of decision, courts must "fill in the interstices of federal legislation 'according to their own standards.' " *Warner,* 605 F.Supp. at 526 (quoting *U.S. v. Kimbell Foods, Inc.,* 440 U.S. 715, 99 S.Ct. 1448, 59 L.Ed.2d 711 (1979); *Clearfield*

*Trust Co. v. U.S.,* 318 U.S. 363, 367, 63 S.Ct. 573, 575, 87 L.Ed. 838 (1943)); *see also Bituminous Casualty Corp. v. Lynn,* 503 F.2d 636, 640 (6th Cir.1974).

■ "In the absence of ready-made federal common law and in light of the general reluctance to displace state law without explicit statutory or constitutional direction to do so, the presumption is that state law is adequate and should be adopted by the federal court as the rule of decision." *Warner,* 604 F.Supp. at 526. There being no need for a uniform federal rule in simple contract disputes and no evidence that the application of state contract principles will in any way frustrate operation of the FDIC, or indeed are any different than those generally applied in federal courts, the court will use Michigan law to resolve this case.

In construing a contract, a court's primary task is to give effect to the parties' intention. *Central Jersey Dodge Truck Ctr. v. Sightseer Corp.,* 608 F.2d 1106, 1109 (6th Cir.1979). "When the words of a written contract are clear and unambiguous and have a definite meaning, the court has no right to look to extrinsic evidence to determine their intent." *Id.* (quoting *DeVries v. Brydges,* 57 Mich.App. 36, 41, 225 N.W.2d 195, 198 (1974)). The words of a contract are to be given their plain and ordinary meaning. *Great American Ins. Co. v. Merchants & Manufacturers Mutual Ins. Co.,* 423 F.2d 1143, 1145 (6th Cir.1970). Absent a manifestation of intent to the contrary, "where language has a generally prevailing meaning, it is interpreted in accordance with that meaning." Restatement (Second) of Contracts § 202(3)(A) (1979).

■ Plaintiffs argue that the term fair market value is clear, unambiguous and that the widespread acceptance of its definition renders implausible defendant's contention that it used the term to mean in-place value. Although the Purchase and Assumption Agreement contains a definitional section, neither fair market value nor in place value is included.

There is little doubt that the term fair market value has a universally accepted meaning. Both parties have cited numerous cases which define the term as what a willing buyer would pay to a willing seller, neither being under any compulsion to buy or sell. Witnesses testifying on behalf of both parties corroborated the definition and distinguished fair market value from in-place or in-use value. It is undisputed that Levy Associates used the accepted meaning of the term in arriving at its appraisal of the fair market value of the FF & E at issue here.

This being the case, the court is compelled to attribute to the phrase its accepted definition and to assume that defendant, the drafter of the language, similarly understood it. This conclusion is reinforced by examination of the contract as a whole. Section 3.8 of the Purchase and Assumption Agreement, entitled "Leasehold Improvements: Valuation," provides that leaseholds, like FF & E, will be valued by an appraiser mutually acceptable to the assuming bank and the receiver. In contrast to the valuation of the FF & E, however, "the appraiser will value the leasehold improvements ... taking into account [among other things, the] fair market value of the property *in its present use.*" (emphasis added).

"It is axiomatic that a court in its interpretation should attempt to give meaning to all of the provisions of a contract." *Cincinnati Gas & Elec. Co. v. FERC,* 724 F.2d 550, 555 (6th Cir.1984). "Every word in the agreement must be taken to have been used for a purpose, and no word should be rejected as mere surplusage if the court can discover any reasonable purpose thereof which can be garnered from the whole instrument." *Central Jersey Dodge Truck Ctr.,* 608 F.2d at 1109–10 (quoting *Associated Truck Lines v. Baer,* 346 Mich. 106, 110, 77 N.W.2d 384, 386 (1956); *Laevin v. St. Vincent de Paul Society of Grand Rapids,* 323 Mich. 607, 609–10, 36 N.W.2d 163, 164 (1949)).

The court was presented with no evidence from any party to explain the difference in the contractual language specifying the methods for valuation of FF & E and leasehold improvements. Richard Rieff, the FDIC supervisory liquidation specialist who acted as the closing manager in the Traverse City Bank closing, testified by deposition that the terms "in use" and "fair market value" have different meanings. He further testified that the language of the contract was drafted by the FDIC legal department and that subsequent to the transaction at issue here, he has authored memoranda suggesting that the definitions of "value" and "in-use" be spelled out in future Purchase and Assumption Agreements. Plaintiffs submitted evidence that the language of such agreements was in fact subsequently changed from the "fair market value" of the FF & E to the "in use appraised value."

Regardless of this change in the language of subsequent Purchase & Assumption Agreements drafted by the FDIC, it would be unreasonable to accept defendant's interpretation of the contract. Not only would defendant's interpretation render the words "in its present use" in Section 3.8 of the contract surplusage, depriving them of any impact, but it is belied by other evidence. David Levy, a seven-year employee of Levy Associates, a firm which performs approximately four to five hundred appraisals per year, testified that although an appraisal of the fair market value generally contemplates that the equipment will be sold off on a piecemeal basis, this assumption is not necessarily an accurate reflection of the parties' intent. He stated that such an appraisal might still be valid if the equipment remains on-site and is continued in its use by another company. There are "numerous ways that values can be used, and each instance is specific to itself." He further testified that the firm generally recommends that several value appraisals be conducted for the sale of an ongoing business and that depending on the type of sale, any one might be appropriate. "If for instance the business is going to be sold ... in some kind of friendly buy-out, perhaps [the parties] want

to rely on fair market value ..., that's quite common."

The notion that the parties viewed this transaction as an amicable agreement, akin to a friendly takeover in the corporate context, is evidenced by their mutual understanding of the future usefulness of the FF & E. The parties were aware for instance that the automatic teller machines at the Traverse City Bank were obsolete and would have to be scrapped and that some of the equipment was incompatible with NBD's state-wide system. In addition, the contract provision allowing the FDIC to retain at its option any of the FF & E meant that plaintiffs would be required to purchase replacements for those items so retained. Thus, both parties understood at the outset that despite the immediate reopening of the bank by plaintiffs, the offices would be incomplete and would require additional expenditures in order to be fully operational. Notwithstanding the admission of Gordon Crimmons, an NBD employee, that plaintiffs' knowledge of the incompatability of the existing equipment had little effect on their bid, such circumstances support the reasonableness of a valuation of the FF & E reflecting the reality that despite the requirement that the assuming bank purchase all of the FF & E, the equipment would be insufficient to meet its operational needs and that the price should be adjusted accordingly.

Defendant's argument that plaintiffs should pay the in-place value because the business was ongoing is not persuasive. In-place or in-use value is defined as the cost of equipment of equal age and equal condition, the cost of freighting it in, the cost of set-up and complete de-bugging. According to Mr. Levy's testimony, the in-place value is derived by adding the cost of installation, transportation, wiring and any other cost associated with getting the FF & E into operation to the fair market value. It represents the fair market value of the particular equipment if it had to be set up in a similar, but new location.

Aside from the obvious fact that the contract specified appraisal of the FF & E at its fair market value, a sale of the equipment at its in-place value would eradicate the allowance of any benefit to the assuming bank for its required but futile purchase of the obsolete and incompatible equipment.

Similarly without merit is defendant's contention that plaintiffs could not have relied on the appraiser's interpretation of fair market value when they submitted their bid on March 9, 1984 because the appraisal was not communicated to them until May, 1984. First, the appraiser's interpretation of fair market value was not idiosyncratic. Levy Associates' use of the term was identical to the generally recognized definition. Furthermore, while it is obvious that plaintiffs did not rely on a specific figure prior to May, 1984, they certainly relied on the contract's representation that the appraisal of the FF & E would be calculated at the fair market value and were justified in ascribing to the term its commonly accepted meaning.

Commercial transactions involving the sale of a failed business take many forms. It is the responsibility of the parties to the sale to reduce their agreement to a written contract which accurately reflects its terms. A court's function in construing a contract is "to determine the parties' intent from what they said, and not from what they meant to say." *Johnson Controls, Inc. v. City of Cedar Rapids, Iowa,* 713 F.2d 370, 375 (8th Cir.1983). Subjective intent does not control.

In this case, where defendant was the drafter of the language of the contract which plaintiffs reasonably believed they were required to accept unchanged, and where the definition of the term at issue is universally accepted, the court must conclude that defendant used the term fair market value as it is commonly understood. If defendant meant that the FF & E should have been appraised at its in-place value, the FDIC should have said so explicitly.

Even if the term was ambiguous, which is not the finding of this court, plaintiffs do "not bear the burden of interpreting [the] contract correctly, only of interpreting it

reasonably.... Accordingly, as drafter of the contract, [the FDIC] shoulders the responsibility of seeing that within the zone of reason the words used convey their intended meaning.... The risk of ambiguity rests on the [FDIC]." *Salem Engineering v. U.S.*, 2 Cl.Ct. 803, 807 (1983); *see also U.S. v. Seckinger*, 397 U.S. 203, 210, 90 S.Ct. 880, 884, 25 L.Ed.2d 224 (1970) *Bituminous Casualty Corp.*, 503 F.2d at 640; *Johnson Controls*, 713 F.2d at 375.

Defendant argues that federal law requires this court to examine the market in which the transaction took place in order to determine the meaning of fair market value. The cases upon which defendant relies for this proposition are inapposite. None of the cases defendant cites involved interpretation of a contract. Rather, they dealt with either the interpretation of a federal statute or the Constitution. Two of the cases are condemnation actions in which the ultimate task of the court was to determine whether the price paid by the government to a landowner satisfied the Fifth Amendment's proviso that private property shall not be taken for public use without "just compensation." In that context, courts must necessarily consider all facts and circumstances influencing the price which could reasonably be expected to be agreed upon by a willing buyer and a willing seller. *Almota Farmers Elevator and Warehouse Co. v. U.S.*, 409 U.S. 470, 93 S.Ct. 791, 35 L.Ed.2d 1 (1973); *U.S. v. 760.-807 Acres of Land*, 731 F.2d 1443 (9th Cir.1984).

In the tax cases relied upon by defendant, the issue of fair market value did not involve any contract between the taxpayer and the government, but rather, turned on an evaluation of legislative intent in interpreting particular statutory sections of the Internal Revenue Code. *Selig v. U.S.*, 565 F.Supp. 524 (E.D.Wis.1983), *aff'd*, 740 F.2d 572 (7th Cir.1984); *Anselmo v. Commissioner*, 757 F.2d 1208 (11th Cir.1985). Similarly, *FDIC v. Philadelphia Gear Corp.*, — U.S. —, 106 S.Ct. 1931, 90 L.Ed.2d 428 (1986), involved interpretation of a definition set forth in a federal statute.

This court is clearly not presented with circumstances analogous to those in the cases upon which defendant relies. Interpretation of the federal statute governing operation of the FDIC is not in issue, nor has defendant so argued. This is a simple contract action in which a government agency happens to be a party and to which the application of state law is appropriate.

The court having found that plaintiff's interpretation of the contract was reasonable under the circumstances, and that the proper valuation figure is that designated by the appraiser as the fair market value for both the FF & E which plaintiffs were required to purchase and the FF & E which were retained by the FDIC,

IT IS HEREBY ORDERED that judgment with interest from March 9, 1984 to the date of payment is entered for plaintiffs.

IT IS SO ORDERED.