BURGESS CONSTRUCTION COMPANY, an Alaska Corporation, Plaintiff-Appellee,

v.

M. MORRIN & SON COMPANY, INC., a Utah Corporation, and General Insurance Company of America, an insurance company, Defendants-Appellants.

U. S. for the Use and Benefit of M. MORRIN & SON COMPANY, INC., a Utah Corporation, Plaintiff-Appellant,

v.

BURGESS CONSTRUCTION COMPANY, an Alaska Corporation, and General Insurance Company of America, a corporation, Defendants-Appellees.

No. 74–1701.

United States Court of Appeals, Tenth Circuit.

Argued May 23, 1975.

Decided Nov. 10, 1975.

Rehearing Denied Jan. 14, 1976.

Robert J. McNichols and Patrick A. Sullivan, Spokane, Wash., for appellants M. Morrin & Son Co., Inc., and Gen. Ins. Co. of America.

David K. Watkiss, Salt Lake City, Utah, for appellees Burgess Const. Co. and Gen. Ins. Co. of America.

Before HILL, SETH and HOLLO-WAY, Circuit Judges.

HILL, Circuit Judge.

This litigation arose from the Bureau of Reclamation Soldier Creek Dam project. The appellee, Burgess Construction Company (hereinafter referred to as Burgess), was the prime contractor, and the appellant, M. Morrin & Son Company, Inc. (hereinafter referred to as Morrin), was the concrete subcontractor. Delays in the completion of the subcontract work led to a termination and take-over of Morrin's work by Burgess. Burgess then instituted an action to enforce its right to take over Morrin's work and to recover damages for Morrin's failure to complete its performance on time. Morrin commenced a separate action under the Miller Act[1] alleging Burgess breached the subcontract by delaying Morrin's access to work sites and by wrongfully terminating the subcontract. The actions were consolidated and tried to the court without a jury. General Insurance Company of America, the surety of both parties, was a codefendant in each case but did not actively participate in the litigation.

At the trial, the court entered judgment for Morrin, and findings of fact and conclusions of law consistent therewith, at the close of the evidence. Argu-

---

1. 40 U.S.C. § 270b authorizes such suits in federal court on a government contractor's bond.

ment of the case was deferred until post-trial motions by Burgess were heard. After the parties had submitted briefs and argued the motions, the court set aside the prior judgment and entered new findings of fact and conclusions of law. Judgment was entered for Burgess in the amount of $330,345.88 plus interest. Morrin has appealed.

The facts are complicated and continue to be disputed on appeal. In October, 1970, Burgess was awarded the contract for the construction of a large earthen dam on Soldier Creek, approximately 80 miles east of Salt Lake City, Utah. Thereafter, Morrin and Burgess entered into negotiations culminating in the execution of a subcontract under which Morrin was to do certain concrete work on the project.

While Burgess conducted the earth-moving operations for building the dam, the river had to be diverted through tunnels. The relevant portions of the Morrin-Burgess subcontract called for Morrin to do the concrete work necessary to allow diversion through what was known as the lower tunnel. The factual dispute involves primarily the work on the lower inlet tunnel, the lower outlet tunnel, the gate chamber, and the stilling basin. The lower inlet tunnel is a circular concrete tunnel six feet in diameter and 750 feet long. The lower outlet tunnel is in the shape of an inverted U. It is eight feet high and 800 feet long. Between the inlet and outlet tunnels is the gate chamber—a large, cavernous area 36 feet high and 30 feet long. It contains steel tunnel liners and hydraulic gates which can be raised or lowered to control the flow of the river. The stilling basin is an above-ground structure resembling a large concrete building. Its purpose is to absorb the force and turbulence as the water flows out of the tunnels. Burgess also subcontracted other aspects of the diversion work, including the excavation and the fabrication, delivery and installation of the steel liners and gates.

The issues presented in this appeal relate to the obligations of the parties under the time of performance provisions of the subcontract. Burgess' successful bid was based on its plan to finish construction in two years, even though its contract with the Bureau of Reclamation allowed over three years. Completion within this time frame required diversion of the river before the spring of 1972. This fact was discussed by the parties during contract negotiations and is reflected in the time for completion stated in the subcontract. Morrin was obligated to complete the work here in question by August 1, 1971, with extensions of time equal to any delay in gaining access to the work sites on specified dates.

After the execution of the subcontract, Morrin submitted a schedule to Burgess showing its planned sequence of operation. Morrin planned to work first in the lower inlet tunnel, beginning at the gate chamber and moving outward to the tunnel entrance. The second sequence of operations was the contemporaneous installation of the lower outlet tunnel and the gate chamber. The stilling basin was scheduled for continuous work by a separate crew beginning at the same time as the lower outlet tunnel and gate chamber. Morrin planned to utilize a small railway system to transport both the concrete and the pump, so that no concrete would have to be pumped in from the entrance to the tunnels. Morrin contemplated laying track once into the lower inlet tunnel and once into the lower outlet tunnel, thereby allowing placement of the gate chamber while the railroad was installed in the lower outlet tunnel.

Because of delays in gaining access to work areas, Morrin was required to work first in the stilling basin, second in the lower outlet tunnel, third on the lower inlet tunnel, and fourth in the gate chamber. Instead of installing the railroad twice, Morrin had to install it five times. The extent of delay in each work area is set out below.

LOWER OUTLET TUNNEL. The excavation was to be completed by April 1, 1971. Morrin was able to commence some work in the area on May 18, but

the excavation was not fully completed until June 21, 1971. Morrin completed this work on October 28, requiring over 100 working days instead of the 48 its schedule predicted.

LOWER INLET TUNNEL. This area was likewise to be fully excavated to give Morrin access by April 1, 1971. There is evidence in the record that it was accessible in July and that Burgess requested work be commenced at that time. Morrin did not begin pouring concrete until November.

GATE CHAMBER. The gates and steel tunnel liners were to be delivered by May 15, 1971, and installed by June 1. They were a prerequisite to Morrin's work in the gate chamber because they required embedments in the concrete. The fabricator experienced difficulty in obtaining the type of steel necessary for the liners and did not complete delivery until September 18, 1971. Installation of the gates and liners was not finished until December 26, more than six months beyond the date anticipated in the contract.

THE STILLING BASIN. Morrin scheduled its work here to begin on May 10, 1971, and end on July 17. Work was actually commenced on April 26 and completed in December. A portion of the area was left unexcavated until September 1.

As a result of the delays, Morrin was forced to continue working into the winter months when temperatures dropped as low as –40 degrees. Morrin failed to progress as Burgess felt it should, and on January 17, 1972, Burgess gave notice of its intention to terminate Morrin and prosecute the work itself with Morrin's equipment. Such action was authorized by the subcontract for failure to perform on time. On January 21, 1972, Burgess began the remainder of Morrin's work and completed it in May.

Summarizing the evidence and contentions of each party, Morrin contends Burgess was bound by the contract to make work sites available to Morrin on specified dates and is liable for damages resulting from its failure to do so. Morrin argues its inability to complete performance on time was due solely to delays caused by other subcontractors and attributable to Burgess. Morrin's witnesses indicated it spent over 700 work hours removing rock protrusions and muck left in the tunnels by the excavator in violation of the subcontract terms. Morrin's evidence further indicated that changes in the sequence of its work made timely performance impossible and substantially increased its costs. It also contends winter work was not contemplated when the contract was made, and that winter weather conditions further added to the time and cost of its performance.

Burgess contends it was not bound to make work sites available on any certain date or in a certain order. It contends the dates mentioned in the subcontract were stated as conditions to Morrin's duty to perform by the date set in the subcontract. Burgess' evidence indicates Morrin's inability to perform on time was caused by its inefficiency. Remedial work for correcting errors, inadequate crews, and inadequate work shifts were among the reasons given by Burgess' witnesses for Morrin's delay. There was evidence that the tunnels had been checked for rock protrusions and approved, and any extra work in this regard would have been insignificant. An expert in this type of construction testified that Morrin should have been able to complete work on time notwithstanding the schedule changes. He did not consider it necessary to work in the sequence Morrin planned. Burgess' evidence also indicated winter work was contemplated when the contract was entered, and winter work did not materially change the nature of Morrin's performance.

The fundamental issue in this appeal is whether Burgess was contractually bound to give Morrin access to work sites on the dates stated in the contract. If it was, Burgess breached the contract and the judgment must be reversed. Morrin argues first that Burgess breach-

ed an express covenant to provide access on time. The relevant contract clauses state:

SECTION 4. TIME OF PERFORM-ANCE: The Subcontractor agrees to keep himself informed as to the progress of the project and to faithfully prosecute his work, and the several parts thereof, at such times in such order as the Contractor considers necessary to keep the same sufficiently in advance of the other parts of the project and to avoid any delay in the completion of the construction as a whole. The scheduled TIME OF PERFORMANCE of the work forming a part of this Subcontract is *See Exhibit B.*

The text of Exhibit B reads:

Time for completion of this work shall be as follows:

1. Concrete in lower tunnel, stilling basins and lower trash rack shall be complete to allow diversion of river through tunnel on or before 1 August 1971 *subject to* :

a. Lower tunnel excavation *must be* complete to allow access from both ends by 1 April 1971.

b. Excavation for lower tunnel chute and the stilling basins for both chutes *must be* completed by 1 April 1971.

c. Gates and steel liners for lower gate chamber *must be* delivered on or before 15 May 1971 and installed not later than 1 June 1971.

The subcontractor will be entitled to a time extension equal to any delay created by a, b or c above. (emphasis added)

▬ Morrin argues the use of the words "must be" creates an unconditional obligation by Burgess to complete the work necessary for site access on the stated dates. However, we cannot look only to the words Morrin chooses to emphasize; we must interpret the contract as a whole. 3 Corbin on Contracts § 549 (1960). Clause 1 of Exhibit B is a prom-ise by Morrin to complete its work by August 1, 1971, "subject to" the work necessary for site access being completed at times stated in a, b and c. The words "subject to" usually indicate a condition to one party's duty of performance and not a promise by the other. 17 Am. Jur.2d *Contracts* § 320 (1964). The structure of Exhibit B, clause 1, in its entirety also indicates that subparts a, b and c are not independent covenants, but are conditions. The inferior position of the alleged promises by Burgess indicates the parties did not consider them independent obligations of the same import as the obligation clearly assumed by Morrin in the primary clause. This interpretation is in harmony with Section 4 of the form contract of which Exhibit B is made a part. In Section 4 Burgess expressly reserves the right to direct the time and order of Morrin's performance. We do not find an expression of intent in Exhibit B to bind Burgess otherwise. The record shows that delay is not unusual in construction projects of this magnitude. The provision for extending Morrin's time in the event of delay by Burgess indicates this possibility was contemplated by the parties when the contract was made. In view of the wording and structure of the contract clause and the surrounding circumstances, we do not believe the parties intended to bind Burgess absolutely to provide site access on the specified dates. Rather, we agree with the trial court that this clause states conditions to Morrin's duty to complete its performance at the time stated in the subcontract.

▬ A contracting party may still be liable for damages caused by delay when there is no unqualified warranty or express covenant to provide site access at a definite time. Morrin argues that under the rule of *George A. Fuller Co. v. United States,* 69 F.Supp. 409, 108 Ct.Cl. 70 (1947), Burgess has breached an implied promise it would do nothing to hinder or prevent Morrin's performance. Burgess relies primarily on *United*

*States v. Howard P. Foley Co.*, 329 U.S. 64, 67 S.Ct. 154, 91 L.Ed. 44 (1946),[2] where the Supreme Court held an extension of time clause similar to the one in the present case provided the injured contractor's sole remedy. Morrin treats these cases as stating two separate rules and even argues *Foley* is no longer good authority.[3] However, subsequent cases have harmonized *Fuller* and *Foley*. Both cases are based on the rule that unreasonable delay is a breach of an implied obligation not to hinder or delay the other party's performance, in the absence of a contract clause contemplating and excusing the delay.[4] The court in *L. L. Hall Construction Co. v. United States*, 379 F.2d 559, 563, 177 Ct.Cl. 870 (1966), stated that in cases under this rule:

> the questions on which liability turns . . . are whether defendant was the cause of the delays here, whether it failed to use reasonable diligence and good faith in performance of its

responsibilities under the contract, and whether the contract contemplated and excused the delays.

■■   First, we consider whether the delays which occurred were contemplated and excused by the subcontract. It provides: "The subcontractor will be entitled to a time extension equal to any delay created by a, b or c above." An extension of time clause alone does not necessarily provide an exemption from damages for delay, but:

> It may, in conjunction with other facts, indicate, as it was held in the Foley case, that the . . . [defendant] did not obligate itself to provide materials or a site or to complete certain work by a certain time. In such cases it is a reasonable construction of the contract that delays in doing these things were anticipated and fully provided for by the provision for an extension of time.

**2.** The parties have briefed this case relying primarily on federal cases involving suits on a prime contract by a contractor against the government. In such cases, federal law controls. The law to be applied in suits on subcontracts is not so clear. When the construction of the Miller Act is not in issue and the United States is not a party to the subcontract, some circuits have held state law controls. Other circuits have held federal law controls in all actions under the Miller Act. These cases are collected in *United States v. Western Cas. & Sur. Co.*, 498 F.2d 335, 338 n.4 (9th Cir. 1974). In a Miller Act action on a subcontract, the Supreme Court recently held that uniform rules of national application should control the awarding of attorney's fees. Whether the holding is limited to attorney's fees or extends the application of federal law to all Miller Act cases is not immediately clear. *F. D. Rich Co., Inc. v. United States*, 417 U.S. 116, 94 S.Ct. 2157, 40 L.Ed.2d 703 (1974).

We do not distinguish between state and federal law in this opinion because we find no conflict between our decision and the law of Utah as expressed in *Russell v. Bothwell & Swaner Co.*, 57 Utah 362, 194 P. 1109 (1920). *United States v. Western Cas. & Sur. Co.*, supra.

**3.** Morrin points out that because the result in *Foley* and its progenitors, *United States v. Rice*, 317 U.S. 61, 63 S.Ct. 120, 87 L.Ed. 53 (1942), and *H. E. Crook Co. v. United States*, 270 U.S. 4, 46 S.Ct. 184, 70 L.Ed. 438 (1926),

was considered unjust, changes were made in the required clauses in government contracts. When the most recent changes were made in 41 C.F.R. § 1–7.601 *et seq.*, avoiding the adverse effects of the "Rice" doctrine was one of the expressed reasons. 32 Fed.Reg. 16269 (1967). These required clauses provide for equitable adjustments to the contract in administrative proceedings. They do not change the law of contracts in suits seeking judicial relief for breach of contract. *See United States v. Utah Constr. & Mining Co.*, 384 U.S. 394, 86 S.Ct. 1545, 16 L.Ed.2d 642 (1966). As recently as *Broome Constr., Inc. v. United States*, 492 F.2d 829, 203 Ct.Cl. 521 (1974), the Court of Claims followed the *Foley* holding as a vital principle of law.

In any event, this case does not involve the standard form clauses. The dispute is over a clause drawn and added to the contract by the parties.

**4.** Although not always expressed in exactly the same terms, we believe this rule has been consistently followed. *Broome Constr., Inc. v. United States*, 492 F.2d 829, 203 Ct.Cl. 521 (1974); *L. L. Hall Constr. Co. v. United States*, 379 F.2d 559, 177 Ct.Cl. 870 (1966); *Kent v. United States*, 343 F.2d 349 (2d Cir. 1965); *Commerce Int'l Co. v. United States*, 338 F.2d 81, 167 Ct.Cl. 529 (1964); *Laburnum Constr. Corp. v. United States*, 325 F.2d 451, 163 Ct.Cl. 339 (1963); *see* Restatement of Contracts § 315.

*Kehm Corp. v. United States*, 93 F.Supp. 620, 119 Ct.Cl. 454 (1950).[5] Whether there were "other facts" indicating Burgess was not obligated to provide the work sites at any certain time and not subject to the imposition of damages for delay is largely a question of fact for the trial court. Although the evidence is not overwhelming on this point, Burgess introduced evidence that it was not the intent of the parties to bind Burgess to pay damages should delay of the type encountered actually occur. It was not clearly erroneous [6] for the trial court to base its decision on this evidence rather than Morrin's evidence to the contrary. Therefore, we affirm the trial court's holding that the delay was contemplated by the subcontract, and that Burgess is not liable for damages caused by the delay.

▬ Even if we decided the extension of time was not the sole remedy, Morrin still could not recover. Breach of an implied promise not to hinder or delay the other party's performance is not established merely by proving there was delay. The delay must be unnecessary, unreasonable or due to defendant's fault. *Broome Construction, Inc. v. United States*, 492 F.2d 829, 203 Ct.Cl. 521 (1974).[7] There is no contention that Burgess acted in bad faith. On the contrary, Morrin took the position that the reason or necessity for the delay was immaterial. When Burgess' counsel sought to examine a witness concerning the reason for delay in obtaining the steel · for the gates and tunnel liners, Morrin objected. Its counsel stated, "I don't see any materiality of his difficulty in obtaining steel. . . . As far as we were concerned, there was a certain time it was supposed to be there, and where he got it and what difficulty he had is immaterial to this case. . . ." The objection was sustained.

Nevertheless, testimony was admitted indicating Burgess acted in good faith and its delay was not unreasonable or due to its fault. This testimony was admitted on issues primarily relating to whether Morrin's inability to complete its work on time was due to Burgess' delay or its own inefficiency. We do not attribute perfection to Burgess. However, neither do we find the type of delay by Burgess that constitutes a breach of an implied promise not to hinder or delay the subcontractor.

▬ We must now determine whether Burgess breached the subcontract by terminating Morrin and taking over the remainder of its work. Morrin does not question the validity of the termination clause which gave Burgess the right to terminate should Morrin fail to comply with the time of performance provisions of the subcontract.[8] Morrin's only argument in this regard is that the decision to terminate was based on inaccurate information concerning the cause of Morrin's inability to complete its work on time. However, there is substantial evidence in the record confirming that Morrin was not able to complete performance on time and that Burgess was justified in exercising its power of termination.[9] We find that Burgess complied

5. Some cases state there must be a clause "expressly" exempting defendant from liability. *See, e. g., L. L. Hall Constr. Co. v. United States*, 379 F.2d 559, 177 Ct.Cl. 870 (1966). Under this statement, an extension of time clause could be considered insufficient under any circumstances to "expressly" negate liability for damages. However, a reading of several cases (*see* cases cited note 4, *supra*) indicates *Kehm* correctly states the rule. Moreover, *Hall* cites *Kehm* with approval.

6. F.R.Civ.P. 52(a).

7. *See Chalender v. United States*, 119 F.Supp. 186, 127 Ct.Cl. 557 (1954); cases cited note 4, *supra*; 4 Corbin on Contracts § 947 (1951).

8. Termination clauses are valid. *Goltra v. Weeks*, 271 U.S. 536, 46 S.Ct. 613, 70 L.Ed. 1074 (1926); 3A Corbin on Contracts § 721 (1960).

9. There was evidence that Burgess held several meetings with Morrin prior to the take-over and had expressed its concern with Morrin's poor performance. As early as October 7,

with the terms of the subcontract's termination clause and was not guilty of a breach.

■ The trial court enumerated 31 findings of fact. Morrin contends 19 of them were clearly erroneous. Were we to look only at Morrin's evidence, we might be able to agree with its contentions, but we must look at the whole record.[10] As the facts stated in this opinion disclose, the evidence was conflicting in varying degrees on every major point of contention. In such cases the "clearly erroneous" rule creates a difficult burden for an appellant. To discuss each finding of fact individually would require too many pages of this opinion. Therefore, we will group them according to the issues.

We have already stated our opinion that the evidence was sufficient to support the trial court's finding that Burgess breached neither an express nor an implied promise to provide work sites on certain dates. We likewise have found the evidence sufficient on issues relating to the termination and take-over of Morrin's work. However, Morrin makes an additional argument on this point. The trial court found the last work on which Morrin's time of performance was conditioned was completed on December 27, 1971. Morrin argues this is clearly erroneous because one witness, Morrin's president, testified that work not mentioned in the subcontract, consisting of bypass piping and electrical conduit, was not complete until February 21, 1972, and that four concrete pours in the gate chamber could not be made until this was done. According to Morrin, the trial court should have found the subcontract allowed Morrin two months from February 21, rather than December 27, to com-

plete its work. We do not believe the trial court's finding is erroneous. Other witnesses testified the gate chamber was available for pouring concrete in accordance with the terms of the subcontract on December 27, 1971. Moreover, the evidence indicates it was clear at the time of termination that Morrin would be unable to complete on time. Nowhere does Morrin argue that it could.

■ Of the other findings Morrin contests, many concern whether Morrin's inability to perform on time was caused by its inefficiency or by extra work and schedule changes forced on it by Burgess. There was substantial evidence that the extra work was insignificant and the schedule changes should not have prevented Morrin from completing on time. In any event, error in these findings could not be a basis for reversal. The schedule of operations was for the convenience of Burgess and Morrin and other subcontractors in coordinating the work. Burgess did not guarantee that Morrin would be allowed to work in the sequence its schedule proposed. On the contrary, Burgess retained the right to direct the order of Morrin's performance in the manner necessary to the completion of the project as a whole.

■ Finally, Morrin contends certain items of damages in the judgment are not supported by the evidence. Morrin contends it was erroneous to include an amount for overhead in Burgess' damages for the cost of completing Morrin's work. The amount was calculated by allocating a percentage of Burgess' total overhead to the work completed on the Morrin subcontract. Morrin argues there is no proof the extra work actually increased Burgess' overhead or, if it did, in what amount. Under the circum-

1971, Burgess informed Morrin that unless its performance improved, Burgess might take over the work. To this Dean Morrin responded, "Be my guest." Burgess made repeated requests for an updated completion schedule, but received no estimate until after the termination letter. An expert witness testified Morrin should have been able to complete performance within the time allowed in the contract with extensions for delay in site access. In addition, a Bureau of Reclamation inspector testified Morrin's work was substandard and inefficient. He attributed the causes of delay to Morrin.

10. *Kelson v. United States,* 503 F.2d 1291 (10th Cir. 1974).

stances, however, this was the best measure available. Overhead is a proper element of cost of completion damages, and an allocation is a proper measure of the amount. *Vitex Mfg. Corp. v. Caribtex Corp.*, 377 F.2d 795 (3d Cir. 1967); *Grand Trunk Western R. Co. v. H. W. Nelson Co., Inc.*, 116 F.2d 823 (6th Cir. 1941). We have examined the record and conclude there was no error in the other items of damage contested on appeal by Morrin.

Although Morrin may have suffered substantial losses on this transaction, under the terms of the subcontract Burgess committed no breach and Morrin is not entitled to damages. The evidence did establish a breach by Morrin. We find no error in the judgment of the district court.

Affirmed.