559 F.Supp. 414 (1983)
UNITED STATES of America, for the Use of UNITED STATES STEEL CORPORATION; and United States Steel Corporation, Individually, Plaintiff,
v.
CONSTRUCTION AGGREGATES CORPORATION, a Delaware Corporation; and the Travelers Indemnity Company, a Connecticut Corporation, Defendants.
Civ. No. 78-10090.
United States District Court, E.D. Michigan, N.D.
March 15, 1983.
*415 *416 Thomas J. Fleischmann, Phillip Allen, Rooks, Pitts, Fullagar & Poust, Chicago, Ill., for plaintiff.
Irwin Zatz, James Barber, Arvey, Hodes, Costello & Burman, Chicago, Ill., for defendant Const. Aggregates Corp.
Richard Poling, Jr., Moore, Sills, Poling, Wooster & Sinn, Birmingham, Mich., for Travelers Indem. Co.

MEMORANDUM OPINION AND ORDER
JAMES HARVEY, District Judge.
Plaintiff, United States Steel Corporation (USSC) brought this action under the Miller Act, 40 U.S.C. § 270a-d (which requires that such a suit be prosecuted in the name of the United States "for the use of" the plaintiff, 40 U.S.C. § 270b(b)) as a subcontractor on a construction contract between the United States and the defendant, Construction Aggregates Corporation (CAC). In this litigation USSC seeks $1,640,127.53 plus interest and costs which it claims is due and owing for materials supplied to CAC, the prime contractor. CAC has counterclaimed for damages in excess of $8 million allegedly resulting from fraudulent misrepresentations and delays in delivery of the contract materials. The defendant Travelers Indemnity Company, as a commercial surety, provided the payment bond pursuant to 40 U.S.C. § 270a.
The Court, sitting without a jury, held 10 days of trial beginning November 3, 1982. During the trial the Court heard the testimony of 14 witnesses and admitted in evidence over 250 documents, comprised of approximately 5,000 pages. At the conclusion of trial, the parties submitted extensive requests for findings of fact and conclusions of law.
Having considered the pleadings, the testimony of the witnesses, and the documents admitted in evidence, along with the parties' proposed findings of fact and conclusions of law, and otherwise being fully advised, the Court hereby sets forth its Findings of Fact and Conclusions of Law pursuant to FR Civ P 52(a).

FINDINGS OF FACT

BACKGROUND
1.) The use plaintiff (USSC) is a Delaware corporation with its principal place of business in Pennsylvania, and local offices in Michigan.
2.) The defendant CAC is a Delaware corporation with its principal place of business in Illinois.
3.) The Travelers Indemnity Company is a commercial surety, duly licensed to conduct business in Michigan.
4.) USSC owns and operates two limestone quarries in Michigan, one at Rogers City, (also referred to as the calcite quarry) and one at Cedarville. The Rogers City quarry is the largest limestone quarry in the world.
5.) In addition to supplying USSC's internal operations, these quarries produce raw materials that are sold to outside chemical plants, cement manufacturers, and also to marine contractors for later use in construction projects.
6.) In early January, 1976, Mr. Gerald Lakins, the manager of raw materials sales for USSC, became aware of a potential sale of over one million tons of limestone. This limestone was to be used in the construction *417 of an impoundment project known as the Saginaw Bay Diked Disposal Facility, Lake Huron, Michigan. Accordingly, USSC began to prepare a bid estimate for the project.
7.) The U.S. Army Corp of Engineers (Corps) charged with the responsibility of managing the project, issued a formal advance notice to bidders on January 16, 1976. The advance notice stated that the project was to be completed by June 30, 1978.
8.) On February 6, 1976 the Corps issued an invitation for bids for the construction of the Saginaw Bay Diked Disposal Facility.
9.) The Dike facility is a 13,900 foot perimeter dike enclosure (roughly the shape of a kidney), intersected by an east-west cross dike. The width of the dike at its crown is 10 feet, sloping at a 2 to 1 rate to a base width of 60 feet. Its total height is 29 feet, with approximately 14 feet above the water level.
10.) The primary purpose of this 288-acre enclosure is to contain the dredgings from the Saginaw River and Saginaw Bay shipping lanes. The dredgings have been classified as "polluted" and pursuant to the Clean Water Act must be confined.
11.) The dike is constructed entirely of limestone in varying gradations. The core, or center of the dike wall, consists of over one million tons of "prepared" limestone. Prepared limestone is small stone, ranging in size from a pebble to about six inches in diameter. A plastic filter cloth, designed to permit water to pass through while retaining the polluted dredgings, was placed over the core of prepared limestone.
12.) The next step in the construction process is to place two layers of progressively larger rock on the sloping sides of the core. The first layer was "underlayer" and "riprap" stone, ranging from 30 pounds to 300 pounds per stone. The outer layer is composed of "cover" stone, ranging from 250 pounds to 2,100 pounds per stone. The cover stone is divided into weight classifications of 250 to 600 pounds, 600 to 1300 pounds, and 1300 to 2100 pounds. The primary dispute before this Court concerns the 1300 to 2100 pound stone.
13.) Nine bids were received by the Corps, and CAC was the low bidder at $11,581,100.00. The Corps' estimated cost was $16,211,364.00.
14.) Pursuant to the Miller Act, defendant CAC (the principal) and defendant Travelers (the surety), on or about March 19, 1976, executed a Miller Act Bond to the United States of America, wherein CAC and Travelers conditionally bound themselves jointly and severally in the sum of $2,500,000. The condition contained in the bond was that if the principal should promptly make payment to all persons supplying labor and material in the prosecution of the work provided for in the prime contract, and any and all duly authorized modifications of the prime contract that may be made, notice of which modifications to the surety being waived, then the obligation would be void and of no effect.
15.) Upon acceptance of the payment bond, the contract was awarded to CAC.
16.) The Corps issued a list of 45 approved sources for the limestone. Both the Rogers City and Cedarville quarries were given unconditional approval.
17.) In determining whether the USSC quarries could provide sufficient stone for the project, CAC relied primarily on the Corps' representations contained in its "approved sources" document.
18.) CAC is a marine contractor with previous experience in constructing limestone aggregate dikes.

CONTRACT FORMATION
19.) On February 26, 1976, USSC sent a quotation to CAC concerning the sale of both prepared and "broken" limestone. Broken stone, also referred to as underlayer, mattress, cover and riprap stone is rock that is broken from the face of the quarry during blasting, but that has not been prepared through the crushing facilities.
20.) Before the bid was prepared, Mr. Lakins contacted Mr. Donn Widmayer, the general superintendent of both the Rogers City and Cedarville quarries, to inquire *418 about the availability of broken stone. Mr. Widmayer indicated that while the Rogers City quarry could not produce the entire tonnage of broken stone, between Rogers City and Cedarville there would be no problem in supplying the required tonnage.
21.) USSC's February 26, 1976 quotation to CAC contained the following language:
"With regard to stone products required for Corps of Engineers project DACW 35-76-B-0015 Diked Disposal Facility, Saginaw, Michigan, we are pleased to submit as follows:

Mattress 1 # to 70 # pieces 35,000 net tons
Stone
Underlayer 30 # to 310 # pieces 100,000 net tons
Stone
Cover 255 # to 3320 # pieces 147,000 net tons
Stone

That portion of the above sizes as is available in the quarry, broken, not sorted. Buyer to perform all further handling in accordance with USS requirements.

At Cedarville, Michigan
 quarry $1.30 per net ton
At Rogers City, Michigan
 quarry $1.35 per net ton

* * * * * *
Material and delivery expected to be required during the last half of 1976 navigation season and completed during 1977, with delivery to be spread evenly over the life of the project insofar as possible."
22.) Upon learning that CAC was the low bidder on the Corps project, Mr. Lakins and Mr. Stewart Steffey, his superior, in an effort to solicit the project, arranged a meeting with representatives of CAC. Mr. Steffey and Mr. Lakins represented USSC at the meeting. Present on behalf of CAC were Ezra Sensibar, chairman of the board of CAC, and James Kwon, a vice-president of CAC.
23.) In the course of this March 19, 1976 convocation, many contract items were discussed. The terms relevant to this lawsuit are the price of the stone, the anticipated date of completion of the project, and the source of the broken stone, i.e. Rogers City or Cedarville. At the close of the meeting, the parties had not reached agreement on any of the above terms.
24.) The parties met again on April 1, 1976 at the offices of CAC. During this meeting, the parties agreed that the project was to be finished by the end of the 1977 work season, not by June of 1978 as required by the Corps. Agreement was also reached on the price of the stone. The prepared limestone was to be sold at $2.72 per delivered ton and the price of the broken stone was $1.15 per ton, not delivered.
25.) During the April 1 meeting, no agreement was reached on the source of the broken stone. CAC insisted that the required tonnage be provided exclusively from the Rogers City quarry, while USSC remained firm in its proposal that a portion of the stone may have to be obtained from the Cedarville quarry.
26.) This disagreement continued. Later in the day of April 1, 1976, Mr. Ezra Sensibar sent a letter to Mr. Steffey with the assigned purpose of "confirming the understanding reached at this office this afternoon between ... USSC and ... CAC." Included in the list of purportedly agreed terms was the following:
"The project will require approximately 270,000 tons of larger stone up to a maximum size of about 2,100 pounds each. A supply of stone adequate to produce this volume of large stone will be furnished by you on the quarry floor at your quarry at Rogers City, Michigan."
Despite Mr. Sensibar's representations, it is clear the parties had not reached agreement on this term.
27.) Subsequently, on April 7, 1976, the parties again attempted to negotiate the above contract term. Through a telephone conference call, Ezra Sensibar and James Kwon discussed the matter with Stewart Steffey and Gerald Lakins. The substance of the conversation was recorded by Ezra Sensibar in a handwritten memorandum: "275,000 tons large rock from Rogers City. Possible that some of this stone may have to come from Cedarville, 3 miles there from quarry to dock."
28.) On April 21, 1976, David Sensibar prepared a purchase order (No. 40123) with an *419 attached letter for the purchase of prepared and broken limestone from USSC. In pertinent part, the purchase order and letter provided that:
"We have attached hereto our Purchase Order No. 40123 dated April 21, 1976 to cover the purchase of specification materials for the construction of a stone perimeter dike and cross dike at the Saginaw River, Diked Disposal Facility, Saginaw Bay, Lake Huron, Michigan. This letter will confirm our understanding that the terms and conditions set forth hereinbelow constitute a part of said Purchase Order.
You agree to supply and deliver (except oversized stone) the quantities of specification materials listed hereinafter in accordance with the Schedule of Delivery furnished to you by CAC and in accordance with the following terms and conditions. The delivery of specification materials will commence within ten (10) days after you receive the Schedule of Delivery from CAC. It is expressly agreed that the Schedule of Delivery may be amended from time to time by CAC according to the actual progress of the job. You further agree that you will comply with the original and any amended Schedule of Delivery furnished to you by CAC and that you will cooperate with the authorized representative of CAC in delivering the materials so as not to delay the progress of the job.
The oversized stone (described in Paragraph 2 as Rip Rap, Underlayer, Cover and Mattress Stone "B") purchased pursuant hereto will be furnished by you on the quarry floor at your quarry at Rogers City, Michigan. (emphasis added)
If the above terms and conditions meet with your approval, please indicate your acceptance by signing this letter in the space provided below and returning the same to us."
29.) The purchase order was neither signed nor returned to CAC.
30.) On April 29, 1976, in response to CAC's purchase order of April 21, 1976, Gerald Lakins prepared and sent the following letter, which stated in pertinent part:
"This will acknowledge your Purchase Order # 40123 dated April 21, 1976 covering specification stone for Diked Disposal Facility at Saginaw, Michigan. It is our sincere desire to have a simple and clear cut understanding of our agreement at the outset. For this reason, we propose to use our quotation of February 26, 1976 with delivery conditions attached thereto, as our basic agreement, subject to the following modifications to reflect our more recent negotiations.
Quantity of broken stone required is estimated at 252,600 net tons, broken, not sorted, with buyer to perform all further handling. United States Steel will use its best efforts to supply the entire tonnage from Rogers City, Michigan quarry but cannot guarantee availability. Any tonnage not available at Rogers City will be supplied from Cedarville, Michigan quarry. (emphasis added) Price at Rogers City or Cedarville quarry to be $1.15 per net ton. United States Steel will provide free of charge, storage area, dock and working area.
We believe this states our agreement in its entirety."
This letter was a valid notification of objection to the conflicting terms in the purchase order. Objection was also given in the telephone conversation set forth in Findings of Fact # 31, # 32, and # 33.
31.) Within a few days of receipt of Gerald Lakins' April 29, 1976 letter, David Sensibar telephoned Mr. Lakins to discuss some of the language contained therein.
32.) Mr. Lakins testified that in addition to discussing the proper notice required to change the delivery schedule and the procedure to be used in selecting and inspecting the stone, they discussed the production of broken stone. David Sensibar questioned the quantity of broken stone available at the Rogers City quarry. Mr. Lakins responded that he had no certain knowledge of how much stone was available since USSC was not able to count the stones; however, he added that Gino Mattiuzo, the CAC project manager, felt that there was *420 enough at Rogers City. Mr. Mattiuzo, also a party to this conversation, confirmed Mr. Lakins' representations.
33.) David Sensibar's version of the conversation confirms Mr. Lakins' testimony to the extent that his expressed concern was that the April 29, 1976 letter did not state the amount of stone to come from Rogers City. He wished to be informed, apparently so that CAC could plan accordingly, what portion of the required tonnage of broken stone would be produced at the Rogers City operation. However, David Sensibar further testified during the trial that he, on behalf of CAC, rejected Lakins' proposal of April 29, 1976 because CAC wanted all the cover stone to come from Rogers City. Mr. Lakins' direct examination testimony does not reflect such a statement by Mr. Sensibar. Furthermore, Mr. Lakins was not questioned on cross-examination as to whether Mr. Sensibar rejected the April 29, 1976 proposal.
34.) The area of admitted agreement in the conversation, i.e. that Mr. Sensibar was seeking a breakdown of broken stone tonnage production between the quarries, lends credence to Mr. Lakins' testimony. Mr. Sensibar's testimony that he wanted the tonnage breakdown between the quarries and yet was not prepared to go forward with the contract unless USSC would supply all the broken stone from Rogers City does not ring true.
While the corporate rules of contract gamesmanship may favor such inconsistent statements, it seems eminently reasonable to this Court that when faced with the contingency of forfeiting the advantages of a single supplier, CAC would retreat from its "all or nothing" demands.
35.) On May 12, 1976, a confirmation letter was sent by Mr. Lakins to David Sensibar. In pertinent part it provides:
"Supplementing my letter of April 29th, I have reviewed the points discussed in our recent telephone conversation with Gino Mattiuzo and with responsible U.S. Steel personnel. The following will serve to clarify these issues and will be considered part of our agreement on your Purchase Order # 40123 covering stone for Saginaw Dike project.
You expressed concern on meeting specifications for large broken stone. United States Steel has been approved as a source of both Calcite and Cedarville by U.S. Corps of Engineers. Gino reports that stone could be rejected for seams which would cause later breakage of large pieces. This is entirely a matter of inspection and selection which should be done before shipment. We decline any responsibility for rejections after loading and shipment. Gino is convinced that there is enough quantity available at Calcite (Rogers City) to serve the entire job.
We believe this now provides the basis for complete agreement and await your advice on schedule of shipments."
36.) On May 18, 1976, David Sensibar sent the following letter to Mr. Lakins.
"Thank you for your letter of May 12. Your four points are acknowledged and accepted. We will, in due course, be sending you our advice on the schedule of shipments. We look forward to a mutually beneficial relationship with you over the next two years."

CONTRACT PERFORMANCE
37.) In April and May, 1976, CAC was negotiating with Glawe, Inc. to provide the service of selecting, sorting and shipping the large broken stone. Since this broken stone was not used by USSC for its internal operations, USSC did not have the equipment or manpower to provide this service. According to the USSC-CAC contract, this service was to be provided by CAC or a subcontractor of CAC.
38.) In late April or early May, CAC entered into a contract with Glawe, Inc. In early June of 1976, Glawe Inc. mobilized at the Rogers City quarry and began working on stone selection.
39.) In mid-July of 1976, Mr. Lakins was informed by Gino Mattiuzo that Glawe, Inc. was behind schedule in providing the large cover stone (1300 to 2100 pounds).
*421 40.) In early August of 1976, Mr. Lakins visited Mr. Mattiuzo in an attempt to resolve the continuing problem of delay in gathering the large cover stone at Rogers City. Mr. Mattiuzo proposed that blasting experts be hired in an attempt to increase the yield of large cover stone.
41.) On August 9, 1976, USSC was informed by Glawe, Inc. that 85,000 tons of 1300-2100 pound size stone was needed by June 1, 1977, but that in their opinion, only 20,000 tons could be produced.
42.) In response to Glawe's and CAC's concern over the lack of 1300 to 2100 pound stone, USSC conducted several special large hole blasts. These blasts were conducted beginning August 20, 1976 at the request and direction of Roger Glawe, and under the supervision of a CAC representative.
43.) USSC's normal production operation required drilling large diameter holes (6-12 inches in diameter) in a determined pattern to variable depths. The holes were loaded with explosives and fired, creating sufficient fragmentation to allow the shovel to remove the rock.
44.) The special blasts described in Finding of Fact # 42 were designed specifically to provide the large cover stone, and were not the normal blasts designed to fragment rock.
45.) Between August 20, 1976 and December 15, 1976 a total of 14 special large hole blasts were conducted in an attempt to provide sufficient large cover stone for CAC.
46.) In late August, a geologist and a blasting expert were retained to make a study of the Rogers City and Cedarville quarries and to recommend methods of increasing the production of large cover stone.
47.) In their report issued September 17, 1976, the experts stated:
"The study indicated that the prevalent geology within the quarry is unfavorable for the efficient mass production of stone within the 1300 to 2100 lbs. range you require. Any meaningful production of this stone will require selective quarrying, that will involve moving very large quantities of rock due to the expected low recovery factors.
"An alternative source of stone occurs at the Cedarville quarry.
"From a technical standpoint the Cedarville stone should be used and the Rogers City source abandoned. A variation would be to produce what can be produced at Rogers City, supplemented by production at Cedarville to meet scheduled placement requirements."
The report went on to state:
"It is our opinion at this time, that the recovery factors of large stone, even with proper blasting techniques, and new orientation of quarry faces, will be low, perhaps in the 5 to 10 percent range. To realize the total requirement of about 130,000 tons, the total weight of rock to be moved at 5 percent recovery would be 2,600,000 tons; at 10 percent it would be 1,300,000 tons."
48.) In accordance with the blasting experts' recommendations, USSC conducted five small diameter hole blasts in addition to the 14 large hole blasts. The five blasts were designed specifically to produce the 1300 to 2100 pound stone.
49.) Although these 19 special blasts produced approximately 450,000 tons of stone, only 7,690 tons of 1300 to 2100 pound stone were retrieved from the blasted material.
50.) USSC drained a portion of the Rogers City quarry, permitting access to an otherwise unavailable section of the quarry in an effort to produce more large cover stone.
51.) Glawe, Inc. was permitted by USSC to select stones from USSC rail cars as they were delivering stone to the crusher. Still, production of 1300 to 2100 pound stone remained low.
52.) Considering the number of special blasts and other efforts by USSC, Mr. Roger Glawe testified that there was nothing more USSC could have done at Rogers City to increase production.
53.) In a letter of September 7, 1976, Ezra Sensibar wrote to Stewart Steffey:
"The quarry at Calcite has failed utterly in the obligation to produce the cover stone, 1300 to 2100 pound size. As a *422 result, our project is paralyzed. We have lost all of the good summer operating season. This cannot be recovered and may make it impossible to complete the project next year, with painful and costly consequences.
"The U.S. Engineer Corps has served notice upon us of default in maintaining our progress schedule has demanded that we provide effective remedies.
"In the meantime, please note that we shall be obliged to look to U.S. Steel to make good our damages."
54.) Steffey responded:
"I share your concern as expressed in your letter of September 7 about the problem of supplying cover stone for your Saginaw Bay project. Gerry Lakins has kept me posted. As we see it, everything within reason has been done to supply suitable stone. This includes quarrying the large stones in various locations as chosen by your experts, changing our blasting practice per their recommendations and cooperating with your people in every way possible.
"In view of the fact that our quotation made no representation of either quality or quantity of stone available at Calcite, we must respectfully decline obligation. We stand ready to assist you if you can suggest how we may do so."
55.) On September 22, 1976, USSC issued a directive that USSC was not going to spend "one damn thin dime extra to produce stone for CAC." However, this order was not acted on.
56.) The order was withdrawn on October 8, 1976, and the quarry superintendent was advised that "we (USSC) must do all possible to assist in getting this job going."
57.) On or about October 17, 1976, CAC decided to abandon Rogers City as the source of 1300 to 2100 pound cover stone.
58.) Glawe's operations were then divided, providing 30 to 1300 pound stone from Rogers City, and 1300 to 2100 pound stone from Cedarville.
59.) USSC, aware of the sequential construction operations, recognized that a delay in providing 1300 to 2100 pound stone would restrict progress at the dike.
60.) At the close of the 1976 work season, approximately 13,000 tons of 1300 to 2100 pound stone had been produced. Nearly 120,000 tons were required to complete the project. Almost 84,000 tons were needed by June 30, 1977.
61.) Effective January 1, 1977, USSC raised the price of the large stone produced at Cedarville from $1.15/ton, as originally agreed, to $2.00/ton. USSC stated this price hike was necessary because of increased costs resulting from the extra work required in placing the stone on the quarry floor at Cedarville.
62.) By the end of 1977 (the scheduled completion date), approximately 80% of the stone had been placed in the dike.
63.) On October 21, 1978, almost one year after the estimated completion date, CAC completed the project. This one year delay occurred even though USSC had, by February 1978, made final delivery of all stone necessary to complete the project.
64.) The Saginaw Bay Diked Disposal Facility was plagued by delays from its outset. For example, Glawe's production techniques initially caused much of the stone to be rejected for failure to meet the Corps' gradation requirements. To solve this problem, Glawe was forced to construct additional "grizzlies" (machines designed to sort stone by size). Nonetheless, rejections of stone continued. It was not until October 12, 1976, when the Corps granted substitute gradations, that the problem was solved. This delay was compounded when CAC first blamed Glawe and then USSC for failing to provide sufficient stone.
65.) Similar problems occurred with the 1300 to 2100 pound stone. Again, the Corps' gradation specifications were changed, but not until the winter of 1976-77.
66.) CAC's problems with the Detroit and Mackinac Railroad (D & M) caused further delay. The D & M transported broken stone from the quarry to the job site. The effect of D & M's delayed deliveries is illustrated *423 in a letter dated September 20, 1977, from CAC to D & M. It states:
"The service we have beneficially received from the D & M Railway during the last three weeks has all but paralyzed our job. If we project our production activities to completion based upon what we have experienced in the way of deliveries during these past three weeks we arrive at the irrefutable conclusion that we will be unable to complete the contract in accordance with our most recent warrants to the Owner and will as a direct consequence be forced through another non-operating winter and into next spring."
67.) Further, it is apparent from the evidence that Glawe, Inc. lacked the manpower and/or equipment to simultaneously produce sufficient tonnage at Rogers City and Cedarville.
68.) As the following table indicates, when Glawe, Inc. produced 1300 to 2100 pound stone in acceptable monthly levels at Cedarville, a corresponding decrease or complete shutdown occurred at Rogers City:

 Total Rogers City Total Cedarville
1977 Production (in tons) Production (in tons)
Jan. 8,310 1,810
Feb. 5,657 6,267
March -0- 15,496
April -0- 13,450
May 824 12,996
June 8,556 8,967
July 17,127 3,762
August 23,360 2,942
Sept. 10,714 5,925
Oct. 10,987 9,879
Nov. 6,656 10,180
Dec. 5,656 10,878

69.) Glawe, Inc.'s inability to produce the required tonnage caused a substantial portion of the remaining delay.
70.) CAC's failure to conform their actual stone placement rate to their estimated placement rate also contributed to the delay. (Exhibit 67.11)
71.) Thus, contrary to CAC's assertions, USSC was clearly not responsible for all of the delays in the project.
72.) Upon completion of the project, CAC petitioned the Corps' contracting officer for an equitable adjustment to the contract. After an adverse decision, CAC filed an appeal petition with the Board of Contract Appeals for the Army Corps of Engineers.
73.) In their petition, CAC sought an equitable adjustment of the contract price based on the alleged misrepresentations of the Corps concerning the availability of stone at the Rogers City quarry. (See Finding of Fact # 16.)
In order to prevail in their petition, CAC was required to prove that USSC acted properly and employed appropriate quarrying techniques. As stated by the Board, "Failure (by USSC) to employ appropriate quarrying techniques ... would, without question, defeat (CAC's) claim against the government that the source was not as represented."
74.) CAC sustained their burden of proof. The Board of Contract Appeals awarded CAC an additional $2,050,000.00 in the contract price.

USSC BREACH
75.) As noted above, USSC is not responsible for all the delays. However, a portion is properly chargeable to USSC.
76.) USSC was aware in mid-July that the Rogers City quarry was not producing sufficient quantities of 1300 to 2100 pound stone. However, USSC did little to correct the problem until August 20, 1976, when they began conducting special blasts.
77.) Commencing August 20, 1976, USSC employed its "best efforts" to supply the needed stone from Rogers City.
78.) USSC's failure to act swiftly delayed discovery of the quarry's geological limitations. This, in turn, delayed CAC's move to Cedarville for the large stone. Plaintiff's inaction literally froze the progress of the dike.
79.) It is clear to this Court that no productive work was performed from mid-July to August 20, 1976. This amounts to 5 weeks or 35 days of delay for which USSC is responsible. The remaining delay is attributed to factors not properly chargeable to any fault of USSC.

*424 CONCLUSIONS OF LAW
1.) This Court has jurisdiction of this matter pursuant to 40 U.S.C. § 270a-d (Miller Act).
2.) Prior to addressing the substantive law issues generated by this labyrinthian litigation, the Court feels that a brief outline of the competing claims tried in this case would be beneficial.
Although USSC's complaint was the genesis of this dispute, it does not form the bases of the primary substantive issues developed during trial. USSC is seeking payment for materials delivered pursuant to the contract. CAC does not dispute the existence of the contract; their counterclaim raises the issues of (1) which documents comprise the contract; (2) what is the scope of USSC's duties under the contract; (3) fraudulent misrepresentation; and (4) if damages are appropriate, what is the proper measure. Therefore, the following discussion will necessarily focus on the claims of the defendant, CAC.

CHOICE OF LAW
3.) Admittedly, the law to be applied in a Miller Act case brought by a subcontractor against the general contractor "is not so clear." Burgess Construction Co. v. Morrin & Son Co. Inc., 526 F.2d 108, 114 n. 2 (CA10, 1975), cert. denied, 429 U.S. 866, 97 S.Ct. 176, 50 L.Ed.2d 146 (1976).
4.) The Supreme Court has held that "the scope of the remedy as well as the substance of the rights created [by the Miller Act] is a matter of federal, not state law." F.D. Rich Inc. v. United States ex rel. Industrial Lumber Co., 417 U.S. 116, 127, 94 S.Ct. 2157, 2164, 40 L.Ed.2d 703 (1974). Rich was an action for attorney fees under the Miller Act. In holding that federal law applied, the Court stressed the importance of uniformity, and the lack of governing state law on the subject matter. Id. at 127-28, 94 S.Ct. at 2164. It is also important to note that the issue presented in Rich was one of statutory construction. Thus, the question still remains of which law to apply to ordinary contract cases arising under the Miller Act.
5.) As this Court held in its pretrial opinion of February 3, 1982, since federal law does not provide sufficient guidance in deciding the contract law issues presented in this case, it seems appropriate to look to state law as a matter of convenience and practicality.
Therefore, where, as in this case, a construction of the statute is not required, state law provides the governing rule on ordinary contract issues. United States ex rel. Riley v. Diran Co., 597 F.2d 446, 447 n. 1 (CA5, 1979).
6.) Here the appropriate reference is to Michigan law, and where relevant, this Court will apply the UCC as enacted in Michigan. (For the applicability of the UCC to the subject matter of this case, see M.C.L.A. §§ 440.2102; 2105; 2107).

TERMS OF THE CONTRACT
7.) In determining the applicability of M.C.L.A. § 440.2207[1] (UCC2-207) to this case, the Court turns to Comment 1, Section 2-207, which states in relevant part:

*425 "This section is intended to deal with ... the written confirmation, where an agreement has been reached either orally or by informal correspondence between the parties and is followed by one or both of the parties sending formal memoranda embodying the terms so far as agreed upon and adding term not discussed." (emphasis added)
8.) However, the communications between these parties indicate the terms were fully discussed. The question to be decided is which of the discussed terms became part of the agreement.
9.) This Court does not believe the drafters of 2-207 intended its function to be limited by Comment 1. Recognizing that "parties to sales deals ... often call on courts to use 2-207 to decide the terms of their contract after they exchange documents and perform ... the law ... must be sufficiently reliance-oriented to protect the legitimate expectations of the parties." J. White and R. Summers, Uniform Commercial Code, Section 1-2, at 25-26.
The Michigan courts likewise recognize that:
"Businessmen frequently reach firm oral understandings not instantly reduced to writing and signed; that it is commonplace for one or both to confirm such understandings in writing; that not infrequently the writings differ but the parties, nevertheless, commence performance, impelled to do so by the exigencies of the business world. The policy of section 2207 is that the parties should be able to enforce their agreement, whatever it is, despite discrepancies between the oral agreement and the confirmation (or between an offer and acceptance) if enforcement can be granted without requiring either party to be bound to a material term to which he has not agreed."
American Parts Co. Inc. v. American Arbitration Association, 8 Mich.App. 156, 167-168, 154 N.W.2d 5 (1967).
Thus, Section 2-207 clearly applies to cases where, as here, the parties discuss proposed terms through a series of oral and written communications which ultimately produces an agreement. Construction Aggregates Corp. v. Hewitt-Robins Inc., 404 F.2d 505 (CA7, 1968), cert. denied, 395 U.S. 921, 89 S.Ct. 1774, 23 L.Ed.2d 238 (1969).
10.) The parties, in their proposed findings of fact and conclusions of law, present their respective positions as to which documents comprise the contract. The Court finds neither position persuasive and believes the agreed terms must be extrapolated from the following documents: the USSC quote of February 26, 1976, the April 1, 1976 letter from Ezra Sensibar, the CAC purchase order of April 21, 1976, the Lakins letter of April 29, 1976, and the David Sensibar response of May 18, 1976. (Exhibits 10, 11, 13, 14, 15, 16)
11.) As indicated in Finding of Fact # 24, the parties, on April 1, 1976, reached agreement as to certain contract items.
12.) The Court must now apply 2-207(2) to construct the remaining provisions of the contract. The provision in question is whether USSC agreed to supply all of the limestone from the Rogers City quarry, or whether they were obligated to use their "best efforts" at Rogers City, with any remaining tonnage to come from Cedarville. For the reasons set forth below, the Court believes the latter clause properly reflects the agreement.
13.) As reflected in Findings of Fact # 4, # 5, and # 18, both parties are merchants as defined in MCLA 440.2104.
14.) Pursuant to 2-207(2), the CAC proposal that all the large stone be provided from Rogers City, contained in the purchase order of April 21, 1976, did not become part of the contract. The Lakins letter of April 29, 1976 and subsequent oral objections constituted a valid notification of objection to the proposal. Thus 2-207(2)(c) prevented the proposal from becoming a contract term. (See Findings of Fact # 28 through # 33.)
15.) As indicated in Finding of Fact # 30, the Lakins letter was a counter proposal that "USSC will use its best efforts to supply the entire tonnage from Rogers City, Michigan quarry but cannot guarantee availability. Any tonnage not available at *426 Rogers City will be supplied from Cedarville."
16.) Since the USSC proposal was not objected to (Findings of Fact # 32, # 33, # 34), the 2-207(2)(c) exception does not prevent the proposal from becoming part of the contract.
17.) Despite the lack of objection by CAC, if the USSC proposal materially altered the contract it could not become part of the agreement. 2-207(2)(b). Here, there was no material alteration. As explained in Comment 5, Section 2-207:
"Examples of clauses which involve no element of unreasonable surprise and which therefore are to be incorporated in the contract unless notice of objection is seasonably given are: a clause setting forth and perhaps enlarging slightly upon the seller's exemption due to supervening causes beyond his control, similar to those covered by the provision of this Article on merchant's excuse by failure of presupposed conditions."
18.) Finally, since the purchase order did not limit acceptance to its terms (2-207(2)(a)), the USSC proposal of April 29, 1976, was incorporated in the contract.
19.) The application of common law contract principles provides the same result, since it is clear that the CAC letter of May 18, 1976, accepted the terms contained in the USSC letter of May 12, 1976, which incorporated by reference the April 29, 1976 proposal. (See Findings of Fact # 35, # 36.)
20.) As reflected in Finding of Fact # 79, USSC is responsible for a portion of the delay. Since USSC had agreed to supply the entire tonnage required to complete the project, and to provide it in a timely manner, their delay was a breach of the contract.

FRAUDULENT MISREPRESENTATIONS
21.) CAC claims that beginning in February, 1976, and continuing through October, 1976, USSC fraudulently misrepresented the quantity of available stone in the Rogers City quarry.
22.) To prevail on its claim of fraud, CAC must prove the following elements by clear and convincing evidence:
1.) That USSC made a material misrepresentation;
2.) That it was false;
3.) That when it was made, USSC knew it was false or made it recklessly without any knowledge of its truth;
4.) That USSC made it with the intent that it should be acted upon by CAC;
5.) That CAC acted in justifiable reliance upon it; and
6.) That CAC thereby suffered injury.
Hi-way Motor Co. v. International Harvester Co., 398 Mich. 330, 336, 247 N.W.2d 813 (1976).
23.) In contracting with USSC, CAC relied on the Corps' representations that the Rogers City quarry could produce sufficient amounts of limestone. Indeed, CAC's petition before the Board of Contract Appeals was premised on their reliance on the Corps' alleged misrepresentations. (See Findings of Fact # 17, # 72, # 73, # 74). Therefore, CAC is not entitled to recover under its claim of fraud.
24.) In any event, CAC has failed to sustain its burden of proving that any representations of USSC were made either with the knowledge of falsity or in reckless disregard of the truth.

DAMAGES
25.) Effective January 1, 1977, USSC unilaterally raised the price of broken stone produced at Cedarville. (See Finding of Fact # 61.) In answer to CAC's defense that the price hike lacked consideration, USSC relies on M.C.L.A. § 440.2209[2] (UCC 2-209), arguing that a contract modification needs no consideration to be binding.
*427 26.) As reflected in Finding of Fact # 30, USSC agreed to and was bound by a price of $1.15 per ton "at Rogers City or Cedarville." (emphasis added) The price of Cedarville stone was not conditioned on production costs, as USSC now alleges. Nor was the extra work an unforeseen difficulty, since the contract clearly anticipated contingent production at Cedarville.
27.) Thus, USSC's "modification" falls short of 2-209's protective perimeter. As comment two of 2-209 states: "the extortion of a `modification' without legitimate commercial reason is ineffective as a violation of the duty of good faith." In producing stone at Cedarville, USSC did no more than they promised under the contract.
28.) Therefore, USSC's original claim of $1,640,127.53 is reduced by $87,169.59, the amount overcharged, to $1,552,957.94.
29.) We turn now to a determination of the damage resulting from the delay caused by USSC.
30.) From the threshold of this lawsuit CAC has set forth its alleged damages according to the "total cost" method. The lack of guidance from the Michigan courts on this method of damage calculation forces this Court to look beyond the Michigan border for the appropriate law to apply.
31.) The total cost method involves computation of both the actual contract costs and the contract costs as estimated in the bid. The estimated contract costs are then subtracted from actual costs to determine costs due to delay.
Although CAC now claims that its damage calculation is not based on the total cost method, but a variation of it, this Court believes otherwise and holds that CAC is seeking damages through a total cost computation.

 Project costs per audit $ 17,514,722
 Less original estimated costs 10,609,000
 ____________
 Cost over-run 6,905,722
 Less overhead in project 391,000
 ____________
 Direct job loss 6,514,722
 Plus actual overhead at 7% of
 project costs 1,226,030
 Interest during construction 904,000
 Plus profit at 9.2% of project costs 1,613,344
 ____________
 Total Damages 10,258,096
 Less equitable adjustment paid by
 Corps 2,050,000
 Less additional funds from Corps
 for extra work 37,500
 ____________
 Damages sought from USSC $ 8,170,596
 ____________

32.) This damage claim is based on the notion that all unreimbursed contract expenditures made throughout the contract should be reimbursed by USSC. This method, in theory, assists the claimant in proving causation. In practice, it would permit CAC to recover all losses notwithstanding their nature or cause.
33.) In view of the potential harm in utilizing the total cost method, Courts have strictly limited its application. Boyajian v. United States, 423 F.2d 1231, 1238-44 (1970); J.D. Hedin Construction Co. v. United States, 347 F.2d 235, 246-47, 259 (1965).
A party's claim for total cost damages may be allowed only if each of the following factors are present:
1.) The nature of the particular losses makes it impossible or highly impracticable to determine them with a reasonable degree of accuracy;
2.) CAC's bid or estimate was realistic;
3.) CAC's actual costs were reasonable;
4.) CAC was not responsible for the added expenses.
WRB Corp. v. United States, 183 Ct.Cl. 409 (1968); U.S. v. R.M. Wells, 497 F.Supp. 541 (SD Ga., 1980).
34.) As indicated in Findings of Fact # 64 through # 70, USSC is not liable for all of CAC's added expenses. Further, CAC is responsible for a portion of their added expenses. Therefore, CAC's total cost claim is inappropriate and must fail. E.C. Ernst v. Koppers, 626 F.2d 324 (CA3, 1980).
To permit CAC to recover their total costs from USSC would force USSC to pay for loss it did not cause.
35.) Having rejected the total cost method of proving damages, the Court must determine if the record "otherwise contains reasonably satisfactory evidence of damages, or at least is sufficient to afford a basis for a jury verdict." Seger v. United States, 469 F.2d 292 (1972). If the record so fails, the *428 claim must be dismissed for failure of proof. Id., See also Boyajian v. United States, 423 F.2d 1231, 1235 (1970).
36.) Here CAC has the burden of proving their damages to a reasonable degree of certainty. Thornton Construction Co. Inc. v. Mackinac Aggregates Corp., 9 Mich.App. 467, 157 N.W.2d 456 (1968). A mathematical certainty in deciding damages is not required. Godwin v. Ace Iron, 376 Mich. 360, 137 N.W.2d 151 (1965).
While the fact of damages may not be founded on mere speculation, some uncertainty as to the amount of damages is allowable. Home Insurance Co. v. Commercial & Industrial Security Services Inc., 57 Mich.App. 143, 225 N.W.2d 716 (1974); Wolverine Upholstery Co. v. Ammerman, 1 Mich.App. 235, 135 N.W.2d 572 (1965).
37.) As in all breach of contract cases, the proper measure of damages is CAC's actual loss (extra costs) attributable to USSC. Goodwin v. Coe Pontiac, 62 Mich. App. 405, 233 N.W.2d 598 (1975).
38.) The exact amount of additional costs incurred by CAC as a result of USSC's delay in performing its best efforts is difficult, if not impossible to determine due to the multiple causes of the total delay. There simply is no precise formula by which CAC's additional costs chargeable to USSC may be separated from those chargeable to other causes of the delay.
From the inception of this litigation CAC has maintained that USSC was responsible for all delays in the project, and sought to prove damages accordingly. Refusing to retreat from this position, CAC has failed to allocate any portion of USSC's alleged delays to specific contract periods.
Nonetheless, there is a sufficient basis in the facts and inferences drawn from those facts to make an award based on a reasonable degree of certainty.
39.) Initially, the Court must allocate the USSC delay to a definable portion of the 29 months CAC spent on the project. For damage purposes, this project can be divided in two parts: the 22 months prior to March 31, 1978, when USSC completed delivery of the stone and CAC had placed 84% of the stone, and the 7 months after March 31, 1978 when CAC completed the project.
In untangling the 5 weeks of USSC delay from all other sources of delay, this Court finds that USSC could not have caused the delay experienced after March 31, 1978, and therefore the USSC delay is allocated to the first 22 months of the project. However, because of the multiple sources of delay occurring within this 22 months period, (see Findings of Fact # 64 through # 69) it is not possible to more specifically allocate the USSC delay.
40.) Having rejected CAC's total cost claim, this Court concludes that CAC's original cost estimates are the most accurate estimate of costs for which USSC is liable. The estimated total cost of the project was $10,609,000. Therefore, to complete 84% of the project CAC could be expected to expend $8,911,560. This results in average costs of $405,070.91 per month ($8,911,560 ÷ 22 months), or $13,300.00 per day ($8,911,560 ÷ 670 days) (June 1, 1976 to March 31, 1978).
41.) Finally, the Court finds that CAC's failure to pay USSC is a breach of their obligation under the contract.
42.) Thus, USSC is entitled to damages of $1,087,457.94. This is based on USSC's original claim of $1,640,127.53 less $87,169.59 (the amount overcharged) and less $465,500.00, the amount of damages chargeable to USSC's delay, computed by multiplying costs per day of $13,300 by 35 days of USSC delay.
43.) Recognizing the lack of absolute certainty in the above computations, the Court believes that a lack of certainty as to the precise amount of damages should not preclude recovery from a breaching party.

CONCLUSION
Accordingly, for the reasons stated herein, the Court shall enter a judgment for plaintiff in the amount of $1,087,457.94 plus interest.
IT IS SO ORDERED.
NOTES
[1] 440.2207 Additional or different terms in acceptance; contract by conduct

Sec. 2207. (1) A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms.
(2) The additional terms are to be construed as proposals for addition to the contract. Between merchants such terms become part of the contract unless:
(a) the offer expressly limits acceptance to the terms of the offer
(b) they materially alter it; or
(c) notification of objection to them has already been given or is within a reasonable time after notice of them is received.
(3) Conduct by both parties which recognizes the existence of a contract is sufficient to establish a contract for sale although the writings of the parties do not otherwise establish a contract. In such case the terms of the particular contract consist of those terms on which the writings of the parties agree, together with any supplementary terms incorporated under any other provisions of this act. P.A.1962, No. 174, § 2207, Eff. Jan. 1, 1964.
[2] 440.2209 Modification; recision; waiver, retraction Sec. 2209. (1) An agreement modifying a contract within this article needs no consideration to be binding.